1   DAVID R. ISOLA, SBN 150311
2   disola@isolalaw.com
    ISOLA LAW GROUP, LLP
3   405 West Pine Street
4   Lodi, California 95240
    Telephone: (209) 367-7055
5   Facsimile:  (209) 367-7056

6   Attorneys for Plaintiff, Powerine Oil
7   Company, Inc.

8

9              UNITED STATES BANKRUPTCY COURT

10             CENTRAL DISTRICT OF CALIFORNIA

11                  LOS ANGELES DIVISION

12

13   In re                          )   Case No.:  2:12-bk-25842-BR
                                     )
14   LAKELAND DEVELOPMENT            )   Chapter 7
15   COMPANY,                        )
                                     )   Adversary No. 2:16-ap-01249-BR
16        Debtor.                    )
                                     )
17   _____ )
                                     )   FIRST AMENDED COMPLAINT FOR
18   POWERINE OIL COMPANY            )   DECLARATORY RELIEF
19   INC., a California corporation, )
                                     )
20        Plaintiff,                 )
                                     )
21                                   )
22   v.                             )
                                     )
23   JASON M. RUND in his capacity   )
24   as Chapter 7 Trustee, and       )
25   LAKELAND DEVELOPMENT            )
     COMPANY,                        )
26                                   )
27        Defendants.               )

28

                            - 1 –
           FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

1

**COMPLAINT**

2    Plaintiff, POWERINE OIL COMPANY ("Powerine"), by and through its

3  undersigned attorneys, for its Complaint against JASON M. RUND in his capacity

4  as Chapter 7 Trustee ("Trustee") and LAKELAND DEVELOPMENT COMPANY

5  ("Lakeland" or the "Debtor") avers upon information and belief as follows:

6

**INTRODUCTION**

7    1.  This action stems from a dispute between Powerine and the Debtor over

8  the Debtor's unperformed contractual obligations arising from a 1998 Asset Purchase

9  Agreement between Powerine and the Debtor [then known as "CENCO Refining

10  Company"].

11    2.  At the heart of the dispute is ownership and control of certain liability

12  insurance policies purchased by Powerine between the late 1950s and 1986 to protect

13  itself against third-party liabilities arising from the company's oil refining and

14  marketing operations. Powerine estimates that the environmental and toxic liabilities

15  that are currently pending against the company will require a minimum of 7 – 12

16  years to fully resolve at a cost in excess of $20 million.

17    3.  Powerine assigned the insurance policies to the Debtor as part of the 1998

18  Asset Purchase Agreement; in return the Debtor assumed Powerine's environmental

19  and toxic liabilities existing at the time the Asset Purchase Agreement was entered, as

20  well as any future environmental and toxic liabilities asserted against Powerine. The

21  Debtor also agreed to defend, indemnify and hold Powerine harmless from

22  environmental and toxic liabilities existing at the time the Asset Purchase Agreement

23  was entered, and from any future environmental and toxic liabilities asserted against

24  Powerine.

25    4.  For the reasons to be discussed herein, shortly after the Asset Purchase

26  Agreement was entered in August 1998 and continuing through July 2015 when a

27  Chapter 7 Trustee was appointed to take charge of the Debtor's affairs, Powerine and

28  the Debtor's respective officers and directors agreed that implementing the insurance

– 2 –
FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

1   policy assignment and the liability assumption would not be in either company's best

2   interest.

3       5.   Shortly after the Asset Purchase Agreement was entered in August 1998,

4   the officers and directors of both Powerine and the Debtor agreed to forgo completing

5   the insurance policy assignment and liability assumption; as the result of this

6   agreement between Powerine and the Debtor, Powerine presently maintains

7   ownership and control of the policies and serves as the "work party" for purposes of

8   defending and resolving very serious environmental and toxic liabilities.

9       6.   Since assuming control of the Debtor's affairs in July 2015, the

10  Trustee, has not taken any action to complete the policy assignment, the assumption

11  of Powerine's environmental and toxic liabilities, or the defense and indemnity of

12  Powerine's environmental and toxic liabilities.

13      7.   Powerine is presently relying on the liability policies to: (A) Fund the work

14  necessary to investigate and remediate soil and groundwater contamination required

15  by Cleanup and Abatement Order No. 97-118 issued in 1997 by the Los Angeles

16  Regional Water Quality Control Board ("LARWQCB CAO"); (B) Fund the work

17  necessary to investigate and remediate contamination as required by an injunction

18  obtained in 2004 by the Redevelopment Commission of the City of Santa Fe Springs

19  ("SFS-CDC Injunction"); (C) Defend claims and suits brought under the Resource

20  Conservation and Recovery Act, 42 U.S.C. §6972 et seq. ("RCRA) arising from the

21  Omega Chemical Company Federal Superfund Site; and, (D) Fund its defense of

22  multiple lawsuits alleging asbestos-related bodily injury and wrongful death.

23      8.   Powerine's ownership and control of the liability policies is being

24  contested  by two of its insurers based on the August 2015 California Supreme Court

25  decision in <u>Fluor Corp. v. Superior Court</u>, 61 Cal. 4th 1175 (August 20, 2015)

26  ("<u>Fluor</u>"), which reversed decades of California precedent by holding that the

27  insurer's consent is not required for a policyholder to assign its insurance policies to a

28  third-party.

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

1       9. The insurers have brought Motions for Summary Judgment against

2  Powerine in the California Superior Court for Los Angeles County seeking orders to

3  the effect that <u>Fluor</u> has retroactively completed the insurance policy assignment,

4  (notwithstanding the parties' agreements and conduct to the contrary), such that

5  Powerine has no further rights under the policies.

6       10. The Trustee's representatives advised Powerine that if the Debtor comes

7  into ownership and control of the policies, the Trustee will not complete the

8  unperformed obligations under the Asset Purchase Agreement by assuming

9  Powerine's environmental and toxic liabilities.

10       11. The Trustee's representatives advised Powerine that if the Debtor comes

11  into ownership and control of the policies, the Debtor will not defend, indemnify and

12  hold Powerine harmless from environmental and toxic liabilities as called for under

13  the Asset Purchase Agreement.

14       12. The Debtor's obligation to assume Powerine's environmental and toxic

15  liabilities, and to defend, indemnify and hold Powerine harmless from environmental

16  and toxic liabilities was and remains a material, fully integrated, and critical

17  component of the consideration received by Powerine for the assets sold to the

18  Debtor–without either the insurance policies or full performance by the Debtor,

19  Powerine has no means to protect itself from very significant liabilities.

20       13. Prior to the insurers' recent <u>Fluor</u>-based attack on Powerine's status as

21  their insured, and prior to the Trustee's November 2015 repudiation of the Debtor's

22  responsibility for the assumed environmental liabilities and for indemnifying

23  Powerine from them, Powerine had no reason to seek relief in relation to what has

24  been over 17-years of conduct between Powerine and the Debtor whereby,

25  notwithstanding the insurance assignment and corresponding liability assumption,

26  Powerine has used the insurance to defend the liabilities in its own name, leaving the

27  Debtor out of the fray.

28  / / /

---

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

14. This action seeks declaratory judgment delineating: (A) Whether Powerine and the Debtor mutually waived those provisions of the Asset Purchase Agreement relating to the insurance assignment and liability assumption such that the insurance policies cannot be property of the Debtor's estate; (B) Whether the doctrine of promissory estoppel precludes the Trustee from accepting ownership and control of the insurance policies on the Debtor's behalf; (C) Whether the Asset Purchase Agreement is an executory contract subject to §365 of the Bankruptcy Code, 11 U.S.C. §365 which has already been rejected by the Trustee pursuant to §365(d)(1) of the Bankruptcy Code, 11 U.S.C. §365(d)(1); (D) Whether the Debtor must defend, indemnify, and hold Powerine harmless from environmental and toxic liabilities should the Debtor come into ownership and control of the policies; and, (E) Whether the Debtor must comply with the LARWQCB CAO, the SFS-CDC Injunction, and RCRA-based directives, orders, and judgments should the Debtor come into ownership and control of the policies.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction over the action under 28 U.S.C. §§157, 1334, and 2201.

16. This adversary proceeding has been commenced in accordance with Rule 7001(9) of the Federal Rules of Bankruptcy Procedure and is a core proceeding under 28 U.S.C. §157(b).

17. Venue is proper as provided in 28 U.S.C. §1409 because this adversary proceeding is related to and arises in the Debtor's bankruptcy case pending in this District.

## PARTIES

18. Plaintiff, Powerine Oil Company, is a California corporation.

19. On May 4, 2012 Defendant, Lakeland Development Company, filed its voluntary Chapter 11 petition in this Court commencing action No. 2:12-bk-25842-

1   BR; on July 10, 2015 an Order was entered by this Court converting the Chapter 11

2   action to a Chapter 7 action.

### FACTUAL BACKGROUND

4      ***Powerine's Liabilities and Insurance Policies***

5      20. Since the late 1980s, Powerine has relied on its liability insurance for the

6   defense and resolution of environmental and toxic liabilities asserted against the

7   company as the result of its historic oil refining and marketing operations. A schedule

8   of the liability policies at issue is attached hereto as Exhibit A, and the policies shall

9   be collectively referred to hereafter as the "Liability Policies."

10     21. Powerine is presently utilizing the Liability Policies for purposes of its

11   on-going compliance with the LARWQCB CAO issued pursuant to California Water

12   Code §13304, and the SFS-CDC Injunction issued in 2004 pursuant to the Polanco

13   Act, (California Health & Safety Code §33459 et seq.), which both require that

14   Powerine investigate and eventually remediate adverse impacts to groundwater

15   caused by Powerine's former refining operations in an approximately 2-mile long by

16   1-mile wide area in Santa Fe Springs, California.

17     22. Powerine is presently utilizing the Liability Policies for purposes of

18   complying with the LARWQCB CAO requirement that Powerine investigate and

19   eventually remediate a 14-acre area in the City of Norwalk, California where

20   approximately 4-feet of jet fuel is floating on top of the water table which

21   LARWQCB alleges was caused by a historic Powerine pipeline release.

22     23. Powerine is presently utilizing the Liability Policies for purposes of

23   defending a 100-plus party suit, <u>Alcoa, et al. v. APC Investments, et al.</u>, United States

24   District Court for the Central District of California, Case No. 2:14-cv-06456-GW

25   (Ex) arising from the Omega Chemical Company Superfund Site ("Omega Action").

26     24. The Plaintiffs in the Omega Action have asserted claims against

27   Powerine pursuant to RCRA §6972, 42 US.C. §6972 et seq., for purposes of

28   enjoining Powerine to abate its contribution to groundwater impacts in a roughly 4-

1 | mile-long plume extending from the City of Whittier, California to the City of

2 | Norwalk, California known as the Omega Federal Superfund Site Operational Unit

3 | No. 2 ("Omega OU-2 Claims").

4 |     25. Powerine is presently utilizing the Liability Policies for purposes of

5 | defending suits asserting claims for bodily injury and wrongful death arising from

6 | asbestos exposure to third-party contractors working at the former Powerine refinery.

7 |     26. Powerine's environmental and toxic liabilities represent exposures that

8 | will require a minimum of 7 – 12 years to resolve at a cost in excess of $20 million,

9 | exclusive of attorney's fees and expert costs. Powerine presently has defense counsel

10 | and environmental consultants who, on a daily basis, are using the coverage available

11 | under the Liability Policies to defend and seek to resolve the environmental and toxic

12 | liabilities.

13 | ***The 1998 Asset Purchase Agreement and Insurance Assignment***

14 |     27. In or about July 1998, Powerine and the Debtor [then known as "CENCO

15 | Refining Company"] entered into the Asset Purchase Agreement whereby

16 | substantially all of Powerine's assets were sold to the Debtor, Powerine assigned the

17 | Liability Policies to the Debtor, and the Debtor agreed to assume Powerine's

18 | environmental and toxic liabilities, and to defend, indemnify, and hold Powerine

19 | harmless from such liabilities.

20 |     28. The Asset Purchase Agreement also included an Environmental

21 | Indemnity and Reimbursement Agreement whereby the Debtor agreed to defend,

22 | indemnify, and hold Powerine harmless from the environmental and toxic liabilities

23 | assumed at the time the agreement was entered, plus any future environmental or

24 | toxic liabilities asserted against Powerine. A true and correct copy of the 1998 Asset

25 | Purchase Agreement and Environmental Indemnity and Reimbursement Agreement is

26 | attached hereto as Exhibit B, and shall be referred to collectively hereafter as the

27 | "APA."

28 | ///

29. In order for the Debtor to have fully implemented the liability assumption agreed to in the APA, the Debtor would have been required to contact all governmental and private parties asserting environmental and toxic claims against Powerine at the time the APA was entered to advise them that the Debtor was stepping into Powerine's shoes for purposes of their claims, and that the claimants should release Powerine.

30. In order for the Debtor to fully implement its agreement to defend, indemnify, and hold Powerine harmless from environmental and toxic liabilities, the Debtor would have been required to retain and fund defense counsel on Powerine's behalf for purposes of defending any liabilities where the claimant(s) refused to release Powerine, as well as for purposes of defending and indemnifying Powerine from any liabilities arising after the closing of the APA.

31. Shortly after entering into the APA, an attempt was made to pursue coverage in the Debtor's name from The Hartford Insurance Group under a corporate succession theory–any attempt to pursue coverage on an assignment theory would have been summarily rejected by the insurer based upon then prevailing law.

32. Because of the extreme uncertainty surrounding the Debtor's right to coverage, The Hartford required that Powerine be a signatory to all transactions involving The Hartford's policy.  Based on their experience with The Hartford, and based on the state of insurance law governing policy assignments at the time, Powerine and the Debtor agreed to forgo implementing the APA's insurance assignment and liability assumption.

33. Powerine and the Debtor agreed to forgo implementing the APA policy assignment and liability assumption to protect against the almost certain refusal by the governmental and private party environmental and toxic claimants to substitute the Debtor in Powerine's place for purposes of pursuing their claims.

/ / /

/ / /

– 8 –

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

34. Powerine and the Debtor agreed to forgo implementing the APA policy assignment and liability assumption to protect against the unwanted consequence of causing the Debtor to incur expenses defending and indemnifying Powerine under the Environmental Indemnity and Reimbursement Agreement based on the almost certain refusal by the governmental and private party environmental claimants to substitute the Debtor in Powerine's place for purposes of pursuing their claims.

35. In the judgment of Powerine's and the Debtor's officers and directors, the interests of both Powerine and the Debtor were better served by not taking any action that could disrupt the insurance coverage being afforded to Powerine for purposes of resolving the significant environmental and toxic liabilities.

36. At the time the APA was entered, the Debtor was owned by the Robertson Charitable Remainder Unitrust, Lakeland's CEO was Nelson Happy, and its President was Geoff Soares. Messrs. Happy and Soares agreed to forgo implementing the APA's insurance assignment and liability assumption provisions as not being in the Debtor's best interest; Powerine's officers and directors concurred, and agreed that Powerine would serve as the "work party" utilizing the Liability Policies for purposes of defending and resolving the liabilities.

37. In 2001, the Debtor appointed Lowell Morse President and CEO, Replacing Nelson Happy and Geoff Soares, respectively; Mr. Morse agreed to continue to forgo implementing the assignment of the Liability Policies and assumption of Powerine's liabilities as not being in the Debtor's best interest; Powerine's officers and directors concurred, and agreed that Powerine would continue to serve as the work party utilizing the Liability Policies for purposes of defending and resolving the liabilities. (*See*, Declaration of Lowell Morse, attached as Exhibit C.)

38. In March 2004, all of the Lakeland stock was sold by the Robertson Charitable Remainder Unitrust to EMC Capital Corp., a subsidiary of Energy Merchant Corp. ("EMC"). EMC is the same company that held/holds the Powerine

1  stock, such that following the closing of the Lakeland – EMC transaction, EMC held

2  all of the Powerine stock and all of the Debtor's stock.

3       39.  As the parent company of both Powerine and the Debtor, EMC elected to

4  continue with the mutual agreement between its subsidiaries to forgo implementing

5  the assignment of the Liability Policies and the liability assumption called for in the

6  APA, and to continue to have Powerine utilize the Liability Policies to serve as the

7  work party for purposes of defending and resolving the environmental and toxic

8  liabilities. (*See*, Declaration of Vince Papa, attached as Exhibit D.)

9       ***The Lakeland Bankruptcy***

10      40.  The Lakeland Chapter 11 Bankruptcy action was commenced in or about

11  May 2012.  On July 10, 2015, this Court entered its Order converting the Chapter 11

12  reorganization action into a Chapter 7 dissolution action and appointing Jason Rund

13  as Trustee to permanently wind-down the Debtor's affairs.

14      41.  Since taking control of the Lakeland Chapter 7 Bankruptcy Estate on

15  July 10, 2015, the Trustee has not contacted Powerine for purposes of implementing

16  the Debtor's assumption of Powerine's environmental and toxic liabilities.

17      42.  Since taking control of the Lakeland Chapter 7 Bankruptcy on July 10,

18  2015, the Trustee has not requested that Powerine take action to implement the

19  Debtor's assumption of Powerine's environmental and toxic liabilities.

20      43.  Since taking control of the Lakeland Chapter 7 Bankruptcy Estate on

21  July 10, 2015, the Trustee has not taken action in this Court, or in any other forum for

22  purposes of implementing the Debtor's liability assumption.

23      44.  Since taking control of the Lakeland Chapter 7 Bankruptcy Estate on

24  July 10, 2015, the Trustee has not requested any input, control, or involvement with

25  the defense and resolution of the environmental and toxic liabilities assumed by the

26  Debtor pursuant to the APA.

27  / / /

28  / / /

1     45.  Since taking control of the Lakeland Chapter 7 Bankruptcy Estate on

2 July 10, 2015, the Trustee has not sought an order from this Court pursuant to

3 Bankruptcy Code §365(d)(1) for the Debtor to assume the APA.

4        ***Change in Status Quo - <u>Fluor Corp. v. Superior Court</u>***

5     46.  From a time shortly after the APA was first entered in 1998 and

6 continuing to the present, the Debtor and Powerine have  conducted themselves as if

7 the insurance policy assignment and liability assumption provisions never existed.

8     47.  From a time shortly after the APA was first entered in 1998 and

9 continuing to the present, Powerine has utilized the Liability Policies to serve as the

10 work party for purposes of defending and resolving the environmental and toxic

11 liabilities assumed by the Debtor pursuant to the APA.

12     48.  In August 2015, the California Supreme Court issued its decision in

13 <u>Fluor</u>, over-turning prior precedent by holding that an insurance company's consent is

14 <u>not required</u> to effectuate a policy assignment from the original insured to another

15 party.

16     49.  Powerine's lead insurer, ACE Property & Casualty Insurance Company

17 ("ACE"), along with certain London Market Insurers have embraced <u>Fluor</u> for the

18 proposition that the decision caused the 1998 policy assignment in the APA to be

19 self-actuating, automatic, and irreversible, such that the Debtor is the insured and

20 Powerine is not.

21     50.  The insurers have brought motions for summary judgment in the matter

22 styled <u>ACE Property & Casualty Insurance Company et al. v. Certain Underwriters at</u>

23 <u>Lloyd's London et al.,</u> Superior Court of California, County of Los Angeles, Case

24 No. BC397070 ("ACE Action"), seeking orders to the effect that the Debtor is the

25 insured and Powerine is not. The <u>Fluor</u> motions are set for hearing before the

26 Superior Court on August 17, 2016.

27 ///

28 ///

---

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

51.  The threshold issue of whether the Debtor has any continuing legal or equitable rights to receive the insurance policy assignment under the APA takes priority over and should be decided by this Court in advance of the insurers' _Fluor_ Motion.

52.  The threshold issue of the Debtor's obligations to assume Powerine's environmental and toxic liabilities and to indemnify Powerine from such liabilities should the Debtor come into ownership and control of the Liability Policies takes priority over and should be decided by this Court in advance of the insurers' _Fluor_ Motion.

53.  The threshold issue of whether the Trustee can provide adequate assurances of the Debtor's performance for its yet unperformed obligations under the APA should the Debtor come into ownership and control of the Liability Policies takes priority over and should be decided by this Court in advance of the insurers' _Fluor_ Motion.

### The Trustee's Response to the Insurers' _Fluor_ Position

54.  The Trustee has not formally asserted a position in the ACE Action or in any other forum regarding whether _Fluor_ automatically caused ownership and control of the Liability Policies to move from Powerine to the Debtor, notwithstanding the Debtor and Powerine's agreement and conduct for over 17-years that the assignment would not be implemented.

55.  The Trustee's representatives have advised Powerine that should the Debtor come into ownership and control of the Liability Policies, the Debtor will seek to liquidate the policies in exchange for a sum certain from the insurers in a transaction commonly known as a "policy buy-back."

56.  The Trustee's representatives have advised Powerine that should the Debtor liquidate the Liability Policies in a policy buy-back, the Trustee will be under no obligation to use the liquidation proceeds for purposes of complying with the LARWQCB CAO or SFS-CDC Injunction requirements for the investigation and

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

1    remediation of contaminated groundwater associated with the former Powerine

2    refinery.

3         57. Although the Debtor is specifically identified as a Responsible Party

4    under the LARWQCB CAO (in addition to Powerine), and as a Defendant in the

5    SFS-CDC Injunction (in addition to Powerine), the Trustee disclaims any

6    responsibility on the Debtor's part to comply with the LARWQCB CAO or SFS-

7    CDC Injunction requirements.

8         58. The Trustee's representatives have advised Powerine that should the

9    Debtor liquidate the Liability Policies in a policy buy-back, the Trustee will be under

10   no obligation to use the liquidation proceeds to comply with the LARWQCB CAO

11   requirements to investigate and remediate jet fuel contamination in the City of

12   Norwalk that LARWQCB alleges was caused by a historic Powerine pipeline release.

13        59. Although the Debtor is specifically identified as a Responsible Party

14   under the LARWQCB CAO (in addition to Powerine), the Trustee disclaims any

15   responsibility on the Debtor's part to comply with the LARWQCB CAO

16   requirements relating to jet fuel contamination in the City of Norwalk.

17        60. The Trustee's representatives have advised Powerine that should the

18   Debtor liquidate the Liability Policies in a policy buy-back, the Trustee will be under

19   no obligation to use the liquidation proceeds to address the Omega Superfund

20   Liability, even though the Debtor received a RCRA Notice of Imminent and

21   Substantial Endangerment in November 2014, demanding that the Debtor undertake

22   the necessary work to investigate and remediate groundwater contamination

23   associated with the Omega Superfund Site.

24        61. The Trustee's representatives have advised Powerine that should the

25   Debtor liquidate the Liability Policies in a policy buy-back, the Trustee will be under

26   no obligation to use the liquidation proceeds for purposes of defending,

27   indemnifying, and holding Powerine harmless from the liabilities assumed by the

28   Debtor pursuant to the APA.

1    62.  The laws of the United States and the State of California prohibit the

2    Trustee from diverting any proceeds from the Liability Policies to a use other than

3    resolving the Debtor's and Powerine's environmental liabilities to the United States

4    and the State of California.

## FIRST CAUSE OF ACTION
### (For Declaratory Relief – Waiver and Estoppel)

7    63.   Powerine repeats and re-alleges paragraphs 1 – 62 above as if set forth

8    fully herein.

9    64.  Between the closing of the APA in August 1998 and continuing to the

10   present, the Debtor's officers and directors, as well the Trustee have had full

11   knowledge of the provision in the APA whereby Powerine assigned the Liability

12   Policies to the Debtor.

13   65.  Between the closing of the APA in August 1998 and continuing to the

14   present, the Debtor's officers and directors, as well as the Trustee have had full

15   knowledge of the provisions in the APA whereby the Debtor assumed Powerine's

16   environmental and toxic liabilities, and agreed to defend, indemnify and hold

17   Powerine harmless from environmental and toxic liabilities.

18   66. Shortly after the closing of the APA in  1998, Powerine and the Debtor

19   waived those provisions of the APA regarding the assignment of the Liability Policies

20   and the assumption of the environmental and toxic liabilities such that Powerine has

21   maintained ownership and control of the Liability Policies for purposes of defending

22   and resolving the toxic liabilities, and the Debtor has been left out of the fray.

23   67.  From the time the Trustee was appointed in July 2015 and continuing to

24   the present, the Trustee has not contested that Powerine and the Debtor waived those

25   provisions of the APA regarding the assignment of the Liability Policies and the

26   assumption of the environmental and toxic liabilities.

27   / / /

28   / / /

68.    Between the closing of the APA in August 1998 and continuing to the time the Trustee was appointed in July 2015, Powerine, the Trustee, and the Debtor have conducted themselves consistently with their waiver of the APA provisions regarding the assignment of the Liability Policies and the assumption of the environmental and toxic liabilities, to wit, Powerine has used the Liability Policies for purposes of defending and resolving the environmental and toxic liabilities, and the Debtor has been left out of the fray.

69.    From the time the Trustee was appointed in July 2015 and continuing to the present, the Trustee, the Debtor and Powerine have continued to conduct themselves in accordance with the waiver of the provisions in the APA regarding the assignment of the Liability Policies and the assumption of the environmental and toxic liabilities, to wit, Powerine has used the Liability Policies for purposes of defending and resolving the environmental and toxic liabilities, and the Debtor has been left out of the fray.

70.    The Trustee is estopped from acting inconsistently with the waiver by Powerine and the Debtor of the APA insurance assignment and liability assumption provisions based on over 17-years of conduct by Powerine and the Debtor that is consistent with their agreement to waive these provisions of the APA.

71.    On information and belief, the Trustee disputes that he is estopped from accepting the assignment of the Liability Policies on the Debtor's behalf. There is a present, actual, and justiciable controversy regarding this issue, and declaratory relief by this Court will resolve the entirety of this controversy.

## SECOND CAUSE OF ACTION
### (For Declaratory Relief –Promissory Estoppel)

72.    Powerine repeats and re-alleges paragraphs 1 – 71 above as if set forth fully herein.

/ / /

/ / /

73.  Shortly after entering into the APA in 1998 and continuing to the Trustee's appointment in July 2015, the officers, directors, and parent company of both Powerine and the Debtor have disregarded Powerine's Liability Policy assignment and the Debtor's assumption of Powerine's environmental and toxic liabilities called for in the APA.

74. Powerine and the Debtor decided to forgo implementing the insurance assignment and liability assumption because of their reasonable belief that, (based on pre-Fluor law), any attempt to implement the assignment and assumption would yield the unintended consequence of leaving one or both parties exposed to the environmental and toxic liabilities without the benefit of insurance coverage.

75.  Beginning shortly after the parties entered into the APA in 1998 and continuing to the Trustee's appointment in July 2015, the officers, directors, and parent company of both Powerine and the Debtor fully abided by and conducted themselves in accordance with their decision to forgo implementing Powerine's Liability Policy assignment and the Debtor's assumption of Powerine's environmental and toxic liabilities.

76.  For over 17-years, Powerine has reasonably and justifiably relied on the Debtor's and Powerine's mutual decision not to implement the Liability Policy assignment by serving as the "work party" for purposes of defending and resolving the environmental and toxic liabilities, and by not demanding that the Debtor assume the liabilities and indemnify Powerine from them.

77.  For over 17-years, Powerine and the Debtor have mutually, reasonably, and justifiably relied on each other's decision and conduct regarding the APA Liability Policy assignment and the environmental/toxic liability assumption based on their belief that, (prior to the August 2015 Fluor decision), any attempt to implement the assignment and assumption would yield the unintended consequence of leaving one or both parties exposed to the environmental and toxic liabilities without the benefit of insurance coverage.

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

78.  Powerine's reliance on the parties' mutual decision to forgo implementing the APA Liability Policy assignment and environmental/toxic liability assumption was foreseeable because applicable insurance coverage law before the August 2015 decision in <u>Fluor</u> caused both Powerine and the Debtor to reasonably believe that any attempt to implement the assignment and assumption would yield the unintended consequence of leaving one or both parties exposed to the environmental and toxic liabilities without the benefit of insurance coverage.

79.  Powerine will be irreparably injured by being left bare and vulnerable to very significant environmental and toxic liabilities should the Trustee be permitted to ignore the parties' mutual decision to forgo implementing the APA's Liability Policy assignment, liability assumption, and indemnity provisions.

80. Neither the Debtor nor the Trustee has a legally or equitably recognizable basis to disregard the decision made by Powerine and the Debtor to forgo implementing the APA's Liability Policy assignment and liability assumption.

81. Neither the Debtor nor the Trustee has a legally or equitably recognizable basis to disregard over 17-years of conduct between Powerine and the Debtor that is consistent with their decision to forgo implementing the APA's Liability Policy assignment and liability assumption.

82.  On information and belief, the Trustee disputes that he is promissorily estopped from acting inconsistently with the Debtor's and Powerine's decision to forgo implementing the Liability Policy assignment and liability assumption. There is a present, actual, and justiciable controversy regarding this issue, and declaratory relief by this Court will resolve the entirety of this controversy.

## **THIRD CAUSE OF ACTION**
**(For Declaratory Relief – The Asset Purchase Agreement
Has been Rejected Pursuant to Bankruptcy Code §365(d)(1))**

83.  Powerine repeats and re-alleges paragraphs 1 – 82 above as if set forth fully herein.

---

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

1      84.  Should this Court determine that Powerine and the Debtor have not

2   mutually waived the APA provisions regarding the Liability Policy assignment and

3   liability assumption, and that the Trustee is not promissorily estopped from denying

4   the agreement between Powerine and the Debtor to forgo implementing the Liability

5   Policy assignment and liability assumption, then the Trustee is still precluded from

6   assuming ownership and control of the Liability Policies on the Debtor's behalf based

7   on Bankruptcy Code §365(d)(1).

8      85.  Bankruptcy Code §365(d)(1), 11 U.S.C. §365(d)(1),  provides that if a

9   Chapter 7 trustee does not assume or reject an executory contract or unexpired lease

10   of residential real property or of personal property of the debtor within 60 days after

11   the order for relief, or within such additional time as the court, for cause, within such

12   60-day period, fixes, then such contract or lease is deemed rejected.

13      86. Since the APA was first entered in 1998 and continuing to the present, the

14   Trustee has not taken any measures to assume Powerine's environmental and toxic

15   liabilities as required by the APA. Consequently, those provisions of the APA

16   requiring the Debtor to assume Powerine's environmental and toxic liabilities, and to

17   defend, indemnify, and hold Powerine harmless from the liabilities remain entirely

18   unperformed.

19      87.  The Debtor's obligations to assume Powerine's environmental and toxic

20   liabilities, and to defend, indemnify, and hold Powerine harmless from such liabilities

21   were and remain fully integrated and material components of the consideration to be

22   received by Powerine under the APA. Powerine has not received such consideration

23   even though the real estate and related improvements identified the APA were

24   effectively transferred to the Debtor upon the closing of the agreement in 1998.

25      88.  Recital "B" to the Environmental Indemnity and Reimbursement

26   Agreement states as follows:

27          In accordance with the Purchase Agreement [the APA] and as a material,

28          component in establishing the consideration for the assets purchased

1    thereunder, Seller and Buyer have agreed to enter into this agreement
2    [the Environmental Indemnity and Reimbursement Agreement] to set
3    forth their respective responsibilities for potential environmental
4    liabilities and defense costs related to certain claimed environmental
5    liabilities.

6        89.  A contract is executory for bankruptcy purposes where the obligation of
7    both the bankrupt and the other party to the contract are so far unperformed that the
8    failure of either to complete performance would constitute a material breach excusing
9    the performance of the other. A contract that contains an open-ended indemnity
10   obligation on the bankrupt's part, like the APA does, is also executory for bankruptcy
11   purposes.

12       90.  The Debtor's failure to assume Powerine's environmental and toxic
13   liabilities is a material breach of the APA because without access to either the
14   Liability Policies or full protection from the Debtor, Powerine will be left bare and
15   vulnerable to its environmental and toxic liabilities, resulting in a total forfeiture of
16   invaluable consideration due to Powerine from the Debtor under the APA.

17       91.  Since entering into the APA in 1998 and continuing to the present, the
18   Debtor has not satisfied its duty under the APA to defend, indemnify, and hold
19   Powerine harmless from environmental and toxic liabilities such that the Debtor's
20   obligations to Powerine in this regard remain entirely unperformed.

21       92.  The Debtor's breach of its obligation to defend, indemnify and hold
22   Powerine harmless from environmental and toxic liabilities is material because
23   without access to either the Liability Policies or full protection from the Debtor,
24   Powerine will be left bare and vulnerable to its environmental and toxic liabilities,
25   resulting in a total forfeiture of invaluable consideration due to Powerine from the
26   Debtor under the APA.

27   / / /
28   / / /

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

1    93. The Debtor's obligations under the APA to assume Powerine's
2  environmental and toxic liabilities, and to defend, indemnify and hold Powerine
3  harmless from such liabilities were and remain material components of the
4  consideration due to Powerine under the APA, and to date the Debtor has not taken
5  any steps toward performing its liability assumption and indemnity obligations such
6  that these obligations remain entirely unperformed; consequently, the APA is an
7  executory contract subject to Bankruptcy Code §365(d)(1).

8    94. The Order converting the Lakeland Chapter 11 action into a Chapter 7
9  action and appointing Jason Rund Trustee of the Lakeland Chapter 7 Estate was
10  entered by this Court on July 10, 2015.

11    95. Since being appointed in July 2015 to wind-down the Debtor's estate, the
12  Trustee has not sought an order from this Court for purposes of assuming the APA.

13    96. Had the Trustee intended to assume the APA, the Trustee was required,
14  on or before September 15, 2015, to seek an order from this Court either approving
15  the APA or providing the Trustee with more time to determine whether the APA
16  should be assumed; the Trustee did neither.

17    97. Because the Trustee failed to act on the APA within 60 days after the
18  Order for relief was entered on July 10, 2015, converting the Lakeland Chapter 11
19  action to a Chapter 7 action, the agreement has been rejected by operation of law such
20  that the Debtor can *neither claim any benefit, i.e. ownership and control of the*
21  *Liability Policies, nor be subjected to any burden* arising under the APA.

22    98. On information and belief, the Trustee disputes that the APA has been
23  rejected by operation of Bankruptcy Code §365(d)(1). There is a present, actual, and
24  justiciable controversy regarding the issue, and declaratory relief by this Court will
25  resolve the entirety of this controversy.

26  / / /
27  / / /
28  / / /

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

## FOURTH CAUSE OF ACTION

### (For Declaratory Relief – the Debtor's Obligation to Assume Liabilities and Provide Defense and Indemnity under the Asset Purchase Agreement)

99.   Powerine repeats and re-alleges paragraphs 1 – 98 above as if set forth fully herein.

100.   Powerine never could have assigned its Liability Policies to the Debtor had Powerine not received return consideration in the form of the Debtor's promise to assume Powerine's liabilities existing at the time the APA was entered.

101.   Powerine never could have assigned its Liability Policies to the Debtor had Powerine not received return consideration in the form of the Debtor's promise to defend, indemnify, and hold Powerine harmless from environmental and toxic liabilities arising after the APA was entered.

102.   Powerine's assignment of the Liability Policies under the APA cannot be enforced without also enforcing the Debtor's promise to assume Powerine's environmental and toxic liabilities, and without also enforcing the Debtor's promise to  defend, indemnify, and hold Powerine harmless from environmental and toxic liabilities.

103.   Powerine's assignment of the Liability Policies under the APA cannot be enforced unless and until the Debtor provides adequate assurances to Powerine that the Debtor has the ability to fully perform its promise to assume Powerine's environmental and toxic liabilities, and to defend, indemnify and hold Powerine harmless from such liabilities in perpetuity.

104.  On information and belief, the Trustee disputes that Powerine's assignment of the Liability Policies under the APA cannot be enforced without also enforcing the Debtor's promise to assume Powerine's environmental and toxic liabilities. A present, actual, and justiciable controversy exists regarding this issue, and declaratory relief by this Court will resolve the entirety of this controversy.

/ / /

1    105.   On information and belief, the Trustee disputes that Powerine's

2  assignment of the Liability Policies under the APA cannot be enforced without also

3  enforcing the Debtor's promise to defend, indemnify, and hold Powerine harmless

4  from environmental and toxic liabilities. A present, actual, and justiciable controversy

5  regarding this issue exists, and declaratory relief by this Court will resolve the

6  entirety of this controversy.

**FIFTH CAUSE OF ACTION**
**(For Declaratory Relief – Lakeland's Obligation to Perform Work**
**Under LARWQCB CAO, SFS-CDC Injunction, and RCRA)**

11    106.   Powerine repeats and re-alleges paragraphs 1 – 105 above as if set forth

12  fully herein.

13    107.   Should this Court determine that Powerine and the Debtor have not

14  mutually waived the APA provisions regarding the Liability Policy assignment and

15  liability assumption, that the Trustee is not promissorily estopped from denying the

16  agreement between Powerine and the Debtor to forgo implementing the Liability

17  Policy assignment and liability assumption, that the APA has not been rejected by

18  operation of Bankruptcy Code §365(d)(1), then the Trustee must proffer satisfactory

19  assurances that the Debtor will step into Powerine's shoes for purposes of the

20  LARWQCB CAO, the SFS-CDC Injunction, and RCRA-based Omega liabilities.

21    108.   The LARWQCB CAO was issued against Powerine and the Debtor

22  pursuant to California Water Code §13304, under which the LARWQCB has the

23  jurisdiction and authority to compel a responsible party to perform the work

24  necessary to clean up waste or abate the effects of pollution that threatens the waters

25  of the State of California.

26    109.   Should the Debtor come into ownership and control of the Liability

27  Policies, the Trustee will be legally obligated to utilize any and all proceeds from the

28  Liability Policies for purposes of complying with the LARWQCB CAO because

---

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

1  California Water Code §13304 does not contain any provision whereby LARWQCB

2  may accept money from a responsible party in lieu of the responsible party's

3  performance of work.

4         110.    The SFS-CDC Injunction was issued against Powerine and the Debtor

5  pursuant to California Health & Safety Code §33459 et seq., under which the SFS-

6  CDC has the jurisdiction and authority to compel a responsible party to perform the

7  work necessary to clean up waste or abate the effects of pollution within a "Project

8  Area."

9         111.    Should the Debtor come into ownership and control of the Liability

10  Policies, the Trustee will be legally obligated to utilize any and all proceeds from the

11  Liability Policies for purposes of complying with the SFS-CDC Injunction because

12  California Health & Safety Code §33459 et seq. does not contain any provision

13  whereby the SFS-CDC may accept monies from a responsible party in lieu of the

14  responsible party's performance of work

15        112.   The Debtor received a Notice of Endangerment pursuant to 42 U.S.C.

16  §6972 et seq. relating to the Omega OU-2 Claim in or about August of 2014; under

17  42 U.S.C. §6972 et seq., the Debtor may be compelled to perform the work necessary

18  to abate the effects of solid waste which may present an imminent and substantial

19  endangerment to health or the environment.

20        113.  Should the Debtor come into ownership and control of the Liability

21  Policies, the Trustee will be legally obligated to utilize any and all proceeds from the

22  Liability Policies to perform the work necessary to abate the effects of solid waste

23  which may present an imminent and substantial endangerment to health or the

24  environment because 42 U.S.C. §6972 does not contain any provisions whereby the

25  Debtor may pay money in lieu of performing work.

26                          **RELIEF REQUESTED**

27        Wherefore, Powerine respectfully requests that the Court enter judgment as

28  follows:

---

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

1     A. On the First Cause of Action, for declaratory relief that Powerine and the

2   Debtor have waived the insurance assignment and liability assumption provisions of

3   the APA.

4     B. On the Second Cause of Action, for declaratory relief that the Trustee is

5   promissorily estopped from accepting ownership and control of the Liability Policies.

6     C. On the Third Cause of Action, for declaratory relief that the APA has been

7   rejected by operation of Bankruptcy Code §365(d)(1).

8     D. On the Fourth Cause of Action, for declaratory relief that, should the

9   Debtor come into ownership and control of the Liability Policies, the Trustee must

10  cause the Debtor to defend, indemnify, and hold Powerine harmless from

11  environmental and toxic liabilities.

12    E. On the Fifth Cause of Action, for declaratory relief that should the Debtor

13  come into ownership and control of the Liability Policies, the Trustee must utilize any

14  and all proceeds realized from the Liability Policies for purposes of addressing the

15  obligations created by the LARWQCB CAO, the SFS-CDC Injunction, and orders or

16  directives that may be issued pursuant to 42 U.S.C. §6972.

17    F. For such other and further relief as the Bankruptcy Court deems just and

18  equitable.

19

20                               Respectfully submitted,

21

22  Dated: June 30, 2016          ISOLA LAW GROUP, LLP

23

24                               By: /s/  DAVID R. ISOLA

25                                   DAVID R. ISOLA

26                               Attorneys for Plaintiff, Powerine Oil
                                 Company, Inc.

27

28

---

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

# EXHIBIT A

## SCHEDULE OF INSURANCE

| COMPANY | POLICY NUMBER |
|---|---|
|  |  |
| Aetna Ins. Co. | CG 65 56 83<br>10/74 to 10/75 |
| Aetna Ins. Co. | CG 608578<br>10/75 to 10/78 |
|  |  |
| Central National Ins.<br>Co. of Omaha | CNU 12-20-39<br>10/73 to 10/74 |
| Central National Ins.<br>Co. of Omaha | CNU 12-26-82<br>10/74 to 10/75 |
| Central National Ins.<br>Co. of Omaha | CNU 12-30-08<br>10/75 to 10/76 |
| Central National Ins.<br>Co. of Omaha | CNU 12-56-25<br>10/76 to 10/77 |
| Central National Ins.<br>Co. of Omaha | CNS 9-47-57<br>10/77 to 10/78 |
| Central National Ins.<br>Co. of Omaha | CNU 12-79-39<br>10/77 to 10/78 |
| Central National Ins.<br>Co. of Omaha | CNS 9-44-63<br>10/78 to 10/79 |
| Central National Ins.<br>Co. of Omaha | CNU 03-31-78<br>10/78 to 10/79 |
| Central National Ins.<br>Co. of Omaha | CNS 9-47-57<br>10/79 to 10/80 |
| Central National Ins.<br>Co. of Omaha | CNU 03-49-44<br>10/79 to 10/80 |
| Central National Ins.<br>Co. of Omaha | CNZ 14-16-35<br>10/79 to 10/80 |
| Central National Ins.<br>Co. of Omaha | CNS 9-48-84<br>10/80 to 10/81 |
| Central National Ins.<br>Co. of Omaha | CNU 00-40-80<br>10/80 to 10/81 |
| Central National Ins.<br>Co. of Omaha | CNZ 14-20-56<br>10/80 to 10/81 |
| Central National Ins.<br>Co. of Omaha | CNS 13-29-57<br>10/81 to 2/83 |
| Central National Ins.<br>Co. of Omaha | CNU 00-81-61<br>10/81 to 2/83 |
| Central National Ins.<br>Co. of Omaha | CNZ 00-60-84<br>10/81 to 2/83 |
|  |  |
| Century Indemnity Co. | CIZ 42-63-04<br>2/84 to 2/85 |
|  |  |

1

| Company | Policy Number | Type | Policy Limits |
|---|---|---|---|
|  |  |  |  |
| Insurance Co. of North America (INA) | XCP 14-52-41 2/83 to 2/84 | Excess | 10M part of 100M xs 50M |
|  |  |  |  |
| Underwriters at Lloyd's London | LAB 2579 5/58 to 5/61 | CGL | 200K |
| Underwriters at Lloyd's London | LA 62213 5/58 to 5/61 | CGL | 1.8m XS 200K |
| Underwriters at Lloyd's London | 36098 8/63 to 8/66 | Excess | 1M xs 2M |
| Underwriters at Lloyd's London | ST 12754 8/66 to 10/67 | Excess | 2M xs 3M |
| Underwriters at Lloyd's London | V 21649 10/70 to 10/73 | Excess | 4M xs 1M |
| Underwriters at Lloyd's London | 12732 10/76 to 10/77 | Excess | 32% of 25M xs 10M |
|  |  |  |  |

2

# EXHIBIT B

EXECUTION COPY

ASSET PURCHASE AGREEMENT

by and between

Powerine Oil Company

as "Seller,"

and

CENCO Refining Co.

as "Buyer,"

Dated:  July 24, 1998

# TABLE OF CONTENTS

Page

ARTICLE I.  DEFINITIONS ................................................................................1
   1.1. Defined Terms. ......................................................................................1
   1.2. Other Defined Terms. ............................................................................6

ARTICLE II.  PURCHASE AND SALE OF ASSETS ...........................................6
   2.1. Purchase and Sale of Assets. .................................................................6
   2.2. Assumption of Liabilities. ......................................................................7
   2.3. Excluded Liabilities .............................................................................7
   2.4. Closing Costs. .....................................................................................7
   2.5. Allocation. ...........................................................................................8

ARTICLE III.  CLOSING ...................................................................................8
   3.1. Closing. ..............................................................................................8
   3.2. Deliveries at Closing. ...........................................................................8
   3.3. Consent to Assignment; Non-transferred Assets. .................................9
   3.4. Other Closing Matters. .........................................................................9

ARTICLE IV.  REPRESENTATIONS AND WARRANTIES OF SELLER .............9
   4.1. Organization. .....................................................................................9
   4.2. Authorization. .....................................................................................9
   4.3. Consents and Approvals. ....................................................................10
   4.4. No Conflict or Violation. ....................................................................10
   4.5. Absence of Certain Changes or Events. ..............................................10
   4.6. Financial Statements ..........................................................................10
   4.7. Taxes. ...............................................................................................10
   4.8. Title. .................................................................................................11
   4.9. Litigation. ..........................................................................................11
   4.10. Creditors. ........................................................................................11
   4.11. Employees. ......................................................................................11
   4.12. No Other Agreements to Sell the Assets. ...........................................12
   4.13. No Brokers. ......................................................................................12
   4.14. As Is Where Is ..................................................................................12

ARTICLE V.  REPRESENTATIONS AND WARRANTIES OF BUYER ...............12
   5.1. Organization of Buyer. .......................................................................12
   5.2. Authorization. ....................................................................................12
   5.3. No Conflict or Violation. ....................................................................13
   5.4. Consents and Approvals. ....................................................................13
   5.5. No Brokers. ........................................................................................13

ARTICLE VI.  COVENANTS .............................................................................13

i

07/27/98 10:11

6.1. Covenants of Seller. ...................................................................................................13
6.2. Covenants of Buyer. ...................................................................................................14
6.3. Of Each Party. .............................................................................................................15
6.4. Employee Matters. .......................................................................................................15

ARTICLE VII.  CONDITIONS TO SELLER'S OBLIGATIONS.................................15
7.1. Representations, Warranties and Covenants. ..............................................................16
7.2. No Proceedings or Litigation. .....................................................................................16

ARTICLE VIII.  CONDITIONS TO BUYER'S OBLIGATIONS ..............................16
8.1. Representations, Warranties and Covenants. ..............................................................16
8.2. No Proceedings or Litigation. .....................................................................................16
8.3. Title Insurance. ............................................................................................................17
8.4. Lien Clearance. ............................................................................................................17

ARTICLE IX.  TERMINATION.................................................................................17

ARTICLE X.  ACTIONS BY SELLER AND BUYER AFTER CLOSING ...............18
10.1. Books and Records. ...................................................................................................18
10.2. Cooperation and Records Retention ..........................................................................18
10.3. Tax Elections. ............................................................................................................18
10.4. Indemnification. .........................................................................................................18
10.5. Insurance Policies. .....................................................................................................20

ARTICLE XI.  MISCELLANEOUS ...........................................................................20
11.1. Assignment. ................................................................................................................20
11.2. Confidentiality. ..........................................................................................................20
11.3. Survival of Representations. ......................................................................................21
11.4. Notices. ......................................................................................................................21
11.5. Choice of Law. ...........................................................................................................22
11.6. Entire Agreement; Amendments and Waivers. ..........................................................22
11.7. Multiple Counterparts ................................................................................................22
11.8. Invalidity. ...................................................................................................................22
11.9. Cumulative Remedies. ...............................................................................................22
11.10. Attorneys' Fees. ........................................................................................................22

EXHIBIT

Description of Assets .................................................................................................................. A

Environmental Indemnity and Reimbursement Agreement ........................................................ B

Bill of Sale ................................................................................................................................. C

Assignment and Assumption of Contracts and Warranties ........................................................ D

NY_DOCS\259564.13                                                                07/27/98 10:11

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement"), dated as of July 24, 1998, is by and among CENCO Refining Co., a Delaware corporation ("Buyer") and Powerine Oil Company, a California corporation ("Seller").

### RECITALS

    A.    Seller owns certain land and improvements located in Santa Fe Springs, California, constituting a refinery, together with miscellaneous assets previously used in conjunction therewith, including a pipeline system and miscellaneous items of equipment and other personal property.

    B.    Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, the foregoing assets, upon the terms and subject to the conditions of this Agreement.

### AGREEMENT

NOW THEREFORE, in consideration of the respective covenants and promises contained herein and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto agree as follows:

### ARTICLE I.

### DEFINITIONS

    1.1.    <u>Defined Terms</u>. As used in this Agreement, except as otherwise expressly provided or unless the context otherwise requires, (i) the terms defined in this Article include the plural as well as the singular; (ii) all accounting terms not otherwise defined herein have the meanings ascribed to them in accordance with GAAP; (iii) all references in this Agreement to designated "Articles," "Sections" and other subdivisions are to the designated Articles, Sections and other subdivisions of this Agreement; (iv) the words "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision; (v) "including" shall mean "including, without limitation," "including, without limiting the generality of the foregoing," and other phrases of similar import; and (vi) the following terms shall have the meanings ascribed to them set forth below.

    "<u>Action</u>" shall mean any action, claim, suit, litigation, proceeding, order, labor dispute, arbitral action, governmental audit, inquiry, criminal prosecution, investigation or unfair labor practice charge or complaint.

    "<u>Affiliate</u>" with respect to any Person, shall mean any other Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person. For the purposes of this definition "control" when used with respect to any specified Person means the power to direct or cause the direction of the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the term "controlled" has the meaning correlative to the foregoing.

"Assets" shall mean all of Seller's right, title and interest in and to the Refinery, the Pipelines and other assets used or useful in the operation of the Refinery, including all of Seller's right, title and interest to the following:

      (a)     all Contracts;

      (b)     all Equipment;

      (c)     all Books and Records;

      (d)     all Proprietary Rights and all associated or related goodwill;

      (e)     to the extent transferable, all Permits;

      (f)     all Insurance Policies, subject to the provisions of Section 10.5 hereof; and

      (g)     all rights under or pursuant to all warranties, representations and guarantees made by suppliers in connection with the foregoing assets or services furnished to Seller pertaining to the Assets, to the extent such warranties, representations and guarantees are assignable;

*provided, however*, that except for the Insurance Policies and rights described in clause (g) above, in no event shall the Assets include any cash or cash equivalents, any choses in action or other claims against third parties or any Contract or Permit not transferred pursuant to Section 3.3.

"Assumed Liabilities" shall mean the liabilities specifically assumed by Buyer pursuant to Section 2.2. hereof.

"Benefit Plan" shall mean any employee benefit plan, as defined in Section 3(3) of ERISA and any material benefit arrangement that is not such an employee benefit plan, including (i) each employment or consulting agreement, (ii) each arrangement providing insurance benefits, (iii) each incentive bonus or deferred bonus arrangement, (iv) each arrangement providing termination allowance, severance or similar benefits, (v) each equity compensation plan, and (vi) each deferred compensation plan, that is or was sponsored or contributed to by Seller or any ERISA Affiliate of Seller or with respect to which Seller or any ERISA Affiliate has or had an obligation to contribute.

"Books and Records" shall mean all books, records, lists, ledgers, files, reports, plans, drawings and operating records of every kind and held or maintained by Seller pertaining to the Assets, business, customers, suppliers, distributors or personnel of Seller including (a) all disk or tape files, printouts, runs or other computer-prepared information and Seller's interest in all computer programs required to access, and the equipment containing, all such computer-based information, (b) all product, business and marketing plans, (c) all environmental control records and (d) all sales, maintenance and production records; excluding, however, the financial records, stock books or ledgers or minute books of Seller.

"Business Days" shall mean all calendar days other than Saturdays, Sundays and all days on which national banks in New York, New York are authorized or required by law to close.

2

"Closing Date" shall mean the Scheduled Closing Date, or such other date as Buyer and Seller shall mutually agree upon.

"Code" shall mean the Internal Revenue Code of 1986, as amended, and the rules and regulations thereunder.

"Contract" shall mean any agreement, contract, lease, note, loan, evidence of indebtedness, purchase order, letter of credit, franchise agreement, undertaking, covenant not to compete, employment agreement, license, instrument, obligation, commitment, purchase and sales order and other executory commitment to which Seller is a party or which relates to the Assets, whether oral or written, express or implied.

"Court Order" shall mean any judgment, decision, consent decree, injunction, ruling or order of any federal, state, local or foreign court or governmental agency, department or authority that is binding on any Person or its property under applicable law.

"days" shall mean all calendar days.

"Default" shall mean (i) a material breach of or default under any Contract; (ii) the occurrence of an event that, with the passage of time or the giving of notice or both, would constitute a material breach of or default under any Contract; or (iii) the occurrence of an event that, with or without the passage of time or the giving of notice or both, would give rise to a right of termination or acceleration under any Contract.

"Disclosure Documents" shall mean the Schedules attached hereto or to the letter from Vincent J. Papa to Marshall Staunton dated April 13, 1998, as supplemented and updated to the date hereof.

"Encumbrance" shall mean any claim, lien, pledge, option, charge, easement, security interest, deed of trust, mortgage, right-of-way, encroachment, building or use restriction, conditional sales agreement, encumbrance or other right of third parties, whether voluntarily incurred or arising by operation of law, including any agreement to give any of the foregoing in the future, and any contingent sale or other title retention agreement or lease in the nature thereof.

"Environmental Laws" shall mean all Regulations which regulate or relate to the protection, clean-up and restoration of the environment; the use, treatment, storage, transportation, generation, manufacture, processing, distribution, handling or disposal of, or emission, discharge or other release or threatened release of Hazardous Substances or otherwise dangerous substances, wastes, pollution or materials (whether, gas, liquid or solid); the preservation or protection of waterways, groundwater, drinking water, air, wildlife, plants or other natural resources, or the health and safety of persons or property, including protection of the health and safety of employees; and compensation for personal injury, property damage or damages to natural resources resulting from a release or threatened release of Hazardous Substances or otherwise dangerous substances, wastes, pollution or materials (whether, gas, liquid or solid). Environmental Laws shall include, the Resource Conservation & Recovery Act ("RCRA"), Clean Water Act, Safe Drinking Water Act, Endangered Species Act, Atomic Energy Act, Occupational Safety and Health Act, Toxic Substances Control Act, Clean Air Act, Oil Pollution Act of 1990, Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") and the Hazardous Materials Transportation Act; California Health & Safety Code §25100, *et seq.* and §39000 *et seq.*, California Fish & Game Code §2014 and §2050 *et seq.*,

3

and California Water Code §13000 *et seq.*; and all other analogous or related Regulations, each as amended.

"Equipment" shall mean all of the furniture, furnishings, machinery, equipment, spare parts, supplies, appliances, vehicles and other tangible personal property in which Seller has any interest and which are located in, at or upon the Refinery or are associated with the Pipelines.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" shall mean any Person that, together with Seller as of the relevant measuring date under ERISA, was or is required to be treated as a single employer under Section 414 of the Code.

"Excluded Liabilities" shall mean the Liabilities described in Section 2.3.

"Financial Statements" shall mean the unaudited balance sheet of Seller and its subsidiaries on a consolidated basis, as of the last day of the fiscal year ended December 31, 1997.

"GAAP" shall mean generally accepted accounting principles applied in a manner consistent with past practices.

"Governmental Authority" shall mean any agency, authority, board, bureau, commission, court, department, office or instrumentality of any nature whatsoever of the United States or any other country, including any political subdivision of any thereof, or any officer or official thereof acting in an official capacity.

"Hazardous Substance" shall mean any pollutants, contaminants, chemicals, waste and any toxic, infectious, carcinogenic, reactive, corrosive, ignitable or flammable chemical or chemical compound or hazardous substance, material or waste, whether solid, liquid or gas, including any quantity of asbestos in any form, urea formaldehyde, PCB's, radon gas, crude oil or any fraction thereof, all forms of natural gas, petroleum products or by-products or derivatives, radioactive substance, waste waters, sludges, slag and any other substance, material or waste that is subject to regulation, control or remediation under any Environmental Law.

"Insurance Policies" shall mean any and all insurance policies or rights thereto, now or previously in force and owned by Seller or any predecessor of Seller, including the insurance policies identified on Schedule 1.1 hereto.

"IRS" shall mean the United States Internal Revenue Service.

"Knowledge of Seller" shall mean with respect to Seller, the actual knowledge of Siegfried Hodapp, James Button or Michael Egner.

"Liabilities" shall mean any direct or indirect liability, indebtedness, obligation, responsibility, commitment, expense, claim, deficiency, guaranty or endorsement of or by any Person of any type, whether accrued, absolute, contingent, matured, unmatured or other.

"material adverse effect" or "material adverse change" shall mean any substantial adverse effect or change in the financial or other condition, business, results of operations,

4

prospects, Assets, Liabilities or operations of Seller or on the ability of Seller to consummate the transactions contemplated hereunder, or any event or condition which would, with the passage of time, constitute a "material adverse effect" or "material adverse change", in each case depending upon the context in which the phrase is used.

"ordinary course of business" or "ordinary course" or any similar phrase shall mean the ordinary course of the operation of the Assets consistent with past practice.

"Permits" shall mean all licenses, permits, franchises, approvals, authorizations, consents or orders of, or filings with, or notifications to, any Governmental Authority, whether foreign, federal, state or local, or any other person, necessary for the past or present conduct of, or relating to the operation of the Refinery and Pipelines.

"Permitted Encumbrances" shall mean (i) liens for current Property Taxes not yet due; (ii) with respect to the Refinery, the Encumbrances shown as exceptions on the Title Commitment other than any mortgage, deed of trust, security interest or other similar lien; (iii) materialmen's, mechanics' or other like liens arising in the ordinary course of business for amounts not yet due or which are being contested in good faith by appropriate proceedings; (iv) liens identified in Schedule 4.10 hereto; and (v) other Encumbrances which do not (A) breach any covenant, representation or warranty of Seller in this Agreement; (B) materially adversely affect the use or value of any of the Assets; (C) render Seller's interest in any of the Assets unmarketable; (D) constitute a lien in the nature of a mortgage, deed of trust, security interest or other similar lien; or (E) constitute a lease, sublease or other occupancy agreement that gives any third party any right to occupy or use all or any portion of any of the Assets following Closing.

"Person" shall mean any individual, firm, corporation, partnership, limited liability company, trust, unincorporated organization, Governmental Authority or other entity, and shall include any successor by merger or otherwise of such Person.

"Pipeline(s)" shall mean all of Seller's right, title and interest in and to the refined products and crude oil or other feedstock pipeline(s) depicted on the pipeline map and/or identified on the table attached as Exhibit A hereto.

"Property Taxes" shall mean all state, local and other taxes, levies, imposts, assessments, impositions or other similar government charges levied or assessed against the Assets or the rents or other revenues therefrom, and any premium, including interest, penalties and additions in connection therewith, but excluding all such taxes, assessments or charges measured by the net income of Seller.

"Proprietary Rights" shall mean all of Seller's copyrights, patents, trademarks, service marks, trade names, trade dress, processes, computer software, trade secrets and know-how, all licenses from any party of any of the above, and all other intellectual property or rights thereto owned by Seller and used or useful in the operation of the Assets.

"Refinery" shall mean the land depicted on the refinery map attached as Exhibit A hereto underlying, and the plants, processing units, buildings and other improvements or fixtures constituting, the approximately 49,500 bpd refinery located in Santa Fe Springs, California.

"Regulations" shall mean all laws, statutes, ordinances, regulations, rules, notice requirements, Court Orders, agency guidelines, principles of law and orders of any Governmental Authority, including Environmental Laws.

5

"Representative" shall mean any officer, director, principal, attorney, agent, employee or other representative.

"Scheduled Closing Date" shall mean August 15, 1998.

"Tax Returns" shall mean any returns, reports, declarations, information statements and other documents with respect to Taxes required to be filed with the IRS or any other taxing (or similar) authority, domestic or foreign, including consolidated, combined and unitary tax returns.

"Taxes" shall mean any federal, state, local, foreign or other tax, levy, impost, fee, assessment or other government charge of any kind, including net or gross income, gross receipts, estimated income, windfall profits, production, business occupation, franchise, profits, license, lease, service, service use, utility, Property Taxes, sales, transfer and gains, use, ad valorem, excise, severance, stamp customs, duty, value added, capital stock, superfund or oil spill, payroll, employment, social security, workers' compensation, unemployment compensation or withholding taxes, and any premium, including interest, penalties and additions in connection therewith.

"Title Commitment" shall mean the preliminary title commitment issued by the Title Company, as from time to time amended or supplemented.

"Title Company" shall mean First American Title Insurance Company.

1.2.   Other Defined Terms.  The following terms shall have the meanings defined for such terms in the Sections set forth below:

| Term | Section |
| --- | --- |
| Agreement | Preamble |
| Buyer | Preamble |
| Closing | 3.1 |
| Confidential Information | 11.2 |
| EMC | 2.3(c) |
| Excluded Liabilities | 2.3 |
| Seller | Preamble |

## ARTICLE II.

### PURCHASE AND SALE OF ASSETS

2.1.   Purchase and Sale of Assets.  Upon the terms and subject to the conditions contained herein, as of the Closing (i) Seller will sell, convey, transfer, assign and deliver to Buyer, and Buyer or one or more of its nominees will acquire from Seller, the Assets; and (ii) in consideration for the purchase of the Assets, Buyer shall pay to Seller $15,000,000 less a Three Hundred Thousand Dollar ($300,000) credit for a July option payment previously made and less amounts, if any, owed under the Pipeline Option Agreement dated as of May 1, 1998, by wire transfer of immediately available funds to an account or accounts designated by Seller.

2.2.   Assumption of Liabilities.  Upon the terms and subject to the conditions contained herein, as of the Closing, Buyer shall assume all of the obligations and liabilities of Seller under the Contracts identified in the Disclosure Documents and which accrue after the date hereof and all obligations and liabilities of Seller, whether fixed or contingent, known or unknown, matured or

6

unmatured, liquidated or unliquidated, for (i) the defense of, and any amounts owed in respect of, the superfund claims known as OII and WDI and (ii) any severance obligations owed to current or former employees of Seller as and to the extent set forth in the Disclosure Documents.

2.3.    Excluded Liabilities. Notwithstanding any other provision of this Agreement, Buyer shall not assume or be responsible for, and Seller shall retain and shall discharge, perform and be fully responsible for, all of the liabilities and obligations, fixed or contingent, known or unknown, matured or unmatured of Seller relating to:

(a)    any petroleum terminal, storage facility, service station or other property, other than the Refinery and the Pipelines, now or previously owned or operated by Seller;

(b)    any obligation or liability of Seller for Taxes incurred in connection with the consummation of the transactions contemplated by this Agreement or other Taxes, interest and penalties thereon, if any, incurred or owing by Seller or any Affiliate of Seller prior to the Closing Date; excluding, however, the Assumed Liabilities, sales taxes that may be incurred solely as a result of the transfer of Assets contemplated by this Agreement and any Property Taxes payable on or with respect to the Assets;

(c)    Energy Merchant Corp., a Delaware corporation ("EMC") or any shareholder, employee or Affiliate of EMC, other than Seller;

(d)    any Benefit Plan (other than the severance obligations assumed in Section 2.2) that covers or covered any past, current or prospective employee of Seller or any Affiliate of Seller, including any obligation under any Benefit Plan arising out of any collective bargaining agreement or other agreement between or among (i) Seller or any group representing, or purporting to represent, Seller or any Affiliate of Seller with respect to any such employee; and (ii) any employee employed in the operation of the Refinery or any labor organization, union, group or association representing, or purporting to represent, any such employee; and

(e)    any other liability or obligation of Seller other than as, and then only to the extent, identified in the Disclosure Documents.

2.4.    Closing Costs.

(a)    Seller. Seller shall pay the legal, professional and consultant fees incurred by Seller.

(b)    Buyer. Buyer shall pay (i) the costs of a policy or policies of title insurance insuring ownership of the Refinery in Buyer as of the Closing in the aggregate amount of the Purchase Price allocated thereto pursuant to Section 2.5 hereof or if no such amount is allocated prior to the Closing Date, Fifteen Million Dollars ($15,000,000); (ii) any documentary transfer taxes; (iii) the fees and costs of recording or filing any conveyancing instruments; (iv) any sales, use or other taxes imposed by reason of the transfer of the Assets, including any deficiency, interest or penalty asserted with respect thereto; and (v) the legal, professional and consulting fees incurred by Buyer.

7

2.5.    Allocation. Buyer and Seller will use their best efforts to agree upon an allocation of the Purchase Price prior to the Closing Date in accordance with the allocation method required by Section 1060 of the Code. The parties shall cooperate to comply with the substantive and procedural requirements of Section 1060 and the regulations thereunder, and the allocation, if agreed to, shall be adjusted only if and to the extent necessary to comply with such requirements and each party agrees that it will not take or permit any of its Affiliates to take, for income tax purposes, any position inconsistent with such allocation.

ARTICLE III.

CLOSING

3.1.    Closing. The Closing of the transactions contemplated hereunder ("Closing") shall be held commencing at 10:00 a.m. local time, on the Closing Date at the New York, New York offices of Latham & Watkins or at such other time or place as the parties hereto otherwise designate.

3.2.    Deliveries at Closing.

(a)    By Seller. Seller shall, on the Closing Date, deliver to the Buyer or its nominee:

(i)    a Bill of Sale, in the form attached hereto as Exhibit C, conveying Seller's personal property included in the Assets;

(ii)    a grant deed in the Title Company's standard form;

(iii)    counterpart originals of (i) an Assignment and Assumption Agreement for the Contracts in substantially the form attached hereto as Exhibit D and (ii) an Environmental Indemnity and Reimbursement Agreement in substantially the form of Exhibit B;

(iv)    one or more certificates regarding the tax status of Seller as a domestic corporation; and

(v)    such other bill(s) of sale, deeds, endorsements, assignments and other good and sufficient instruments of sale, conveyance, transfer and assignment, in form and substance reasonably satisfactory to Buyer, with respect to the Assets, as reasonably requested by Buyer, sufficient to vest in Buyer title in and to the Assets in accordance with the provisions hereof.

(b)    By Buyer. Buyer shall deliver to Seller on the Closing Date counterpart originals of (i) an Assignment and Assumption Agreement for the Contracts substantially in the form attached hereto as Exhibit D and (ii) an Environmental Indemnity and Reimbursement Agreement in substantially the form of Exhibit B.

3.3.    Consent to Assignment; Non-transferred Assets. Anything in this Agreement to the contrary notwithstanding, neither this Agreement nor the consummation of the transactions contemplated hereby shall constitute an agreement to assign or an assignment of any Contract or Permit or any claim or right or any benefit arising thereunder or resulting therefrom if an attempted assignment thereof, without

8

the consent of a third party thereto or any Governmental·Authority or agency, would constitute a breach thereof or in any way adversely affect the respective rights or obligations of Buyer or Seller thereunder. If any such consent is not obtained, or if an attempted assignment thereof would be ineffective or would adversely affect the respective rights or obligations of Buyer or Seller thereunder, Seller, at no cost to Seller, shall use its best efforts (i) to provide to Buyer the benefits under any such Contract or Permit (including enforcement for the benefit of Buyer of any and all rights of Seller against a third party thereto arising out of the breach or cancellation by such third party or otherwise) as if such Contract or Permit had been assigned to Buyer and (ii) to obtain as soon as practicable the consent or approval of any such third party or Governmental Authority to the assignment of such Contract or Permit and to transfer such Contract or Permit to Buyer; and any transfer or assignment to Buyer of any property or property rights or any Contract or Permit that shall require the consent or approval of any third party or Governmental Authority shall be made subject to such consent or approval being obtained.

     3.4.    Other Closing Matters. Each of the parties shall take such other actions required hereby to be performed by it prior to or on the Closing Date. Seller shall take all additional reasonable steps as may be necessary or desirable to put Buyer in possession of, and in operational control of, the Assets.

<h2 style="text-align:center">ARTICLE IV.</h2>

<h3 style="text-align:center">REPRESENTATIONS AND WARRANTIES OF SELLER</h3>

     Seller hereby represents and warrants to Buyer as follows, which representations and warranties are, as of the date hereof, and will be, as of the Closing Date, true and correct; subject, however, to any fact or facts disclosed in this Agreement or in the Disclosure Documents or otherwise · disclosed to Buyer during its due diligence investigation of Seller:

     4.1.    Organization. Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of California; has full corporate power and authority to conduct the business presently being conducted by it as it is presently being conducted and to own or lease its assets.

     4.2.    Authorization. This Agreement has been duly executed and delivered by Seller and is, and upon execution and delivery of each of the other instruments required or contemplated to be executed and delivered hereunder by Seller will be, the legal, valid and binding obligations of Seller, enforceable against it in accordance with their respective terms.

     4.3.    Consents and Approvals. Other than in connection with or in compliance with the consents, notices, filings, or registrations with Governmental Authorities which have been identified in the Disclosure Documents that may be necessary in order to transfer to Buyer a Permit or which can be obtained in the normal course of business, to Seller's Knowledge no notice to, declaration, filing or registration with, or authorization, consent or approval of, or Permit from, any Governmental Authority is required to be made or obtained by Seller in connection with the execution, delivery or performance of this Agreement or any other instrument required or contemplated to be executed and delivered hereunder by Seller or the consummation of the transactions contemplated hereunder or thereunder.

     4.4.    No Conflict or Violation. Neither the execution, delivery or performance of this Agreement or any other instruments required or contemplated to be executed and delivered hereunder by Seller or the consummation of the transactions contemplated hereunder or thereunder, will (i) violate or conflict with any provision of the certificate of incorporation or bylaws of Seller or any shareholders' agreement or other similar agreement to which Seller is a party; (ii) result in the creation of any Encumbrance upon any of the Assets under any of the terms, conditions or provisions of any Contract or

9

Permit; or (iii) violate any Regulation, except for such violations, conflicts or creations of Encumbrances which, in the aggregate, would not have a material adverse effect on the value or use of any of the Assets or the ability of Seller to consummate the transactions contemplated hereunder.

    4.5.   Absence of Certain Changes or Events. Since July 1, 1998:

       (i)    there has not been any damage or destruction to, or sale or other disposition of, any material portion of the Assets;

       (ii)    there has not been any increase in, or commitment to increase, the operating expenses of the Assets, including the compensation paid or payable to the employees of Seller, except for increases in the ordinary course which are caused by general economic conditions or factors affecting the refining industry generally; and

       (iii)    there has not been any amendment or termination, or proposed amendment or termination, of any Contract or Permit which, either individually or in the aggregate, would materially adversely affect the value or operation of the Assets.

    4.6.   Financial Statements. Seller has heretofore delivered to Buyer the Financial Statements. The Financial Statements were prepared in accordance with the Books and Records which, in turn, are maintained in accordance with GAAP, and accurately reflect the liabilities of Seller, including liabilities for any Taxes.

    4.7.   Taxes. Seller has properly and accurately completed and filed on a timely basis true and correct Tax Returns and paid all Taxes, in each instance for which Buyer could be made liable as a result of the transactions contemplated by this Agreement or which could result in liens on the Assets, other than Property Taxes on the Refinery and sales taxes imposed on the transfer of the Assets pursuant to this Agreement.

    4.8.   Title. Seller has good and marketable title to the Assets, free and clear of any Encumbrances, except for Permitted Encumbrances.

    4.9.   Litigation. Schedule 4.9 identifies and contains an accurate description of all Actions pending, or to the best of Seller's knowledge, threatened or anticipated against, related to or affecting Seller or the Assets. Except as identified in Schedule 4.9, there are no Actions pending, or to the best of Seller's knowledge, threatened or anticipated against, related to or affecting Seller or the Assets that would (i) have any adverse effect on Seller or the Assets from and after Closing; (ii) delay, limit or enjoin the transactions contemplated hereunder; or (iii) involve any risk of criminal liability on the part of Seller or, from and after Closing, Buyer.

    4.10.   Creditors. To Seller's Knowledge, the Disclosure Documents identify all of the creditors of Seller, and the amounts owed to each, as of the dates set forth thereon, except for contingent liabilities which are not reflected on the Financial Statements. To the best of Seller's Knowledge, Schedule 4.10 identifies all of the liens against the Assets. Except as identified on such Schedule, there are no other liens against the Assets and the amounts required to release such liens do not materially exceed the amounts set forth on such Schedule, plus any interest accrued thereon in the ordinary course since the dates set forth thereon.

    4.11.   Employees. Seller (i) is not a party to any labor agreement with respect to any employees at or in connection with the Refinery and the operation thereof with any labor organization,

                                             

union, group or association; and (ii) to Seller's Knowledge has not experienced any attempt by organized labor or its representatives to make Seller or any of Seller's Affiliates conform to the demands of, or enter into any agreement with, organized labor that would cover any of such employees. Seller is in compliance in all material respects with all applicable laws respecting employment practices, terms and conditions of employment and wages and hours and to Seller's Knowledge is not and has not engaged in any unfair labor practice. Except as set forth is the Disclosure Documents, there is no unfair labor practice charge or complaint against Seller or any of Seller's Affiliates with respect to the operation of the Refinery pending before the National Labor Relations Board or any other Governmental Authority, and to Seller's Knowledge, no presently existing facts or information would lead to any such charge or complaint. Each Benefit Plan has been maintained in compliance with its terms and, both as to form and operation, with the requirements of all applicable statutes, orders, rules and regulations which are applicable to such Benefit Plan, including but not limited to ERISA and the Code. To Seller's Knowledge there are no unfunded benefit liabilities or accumulated funding deficiencies with respect to any Benefit Plan applicable to Seller; neither Seller nor any Affiliate of Seller nor any of the Assets are subject to any lien under ERISA with respect to any such plan; and neither Seller nor any ERISA Affiliate has any liability for unpaid contributions with respect to any Benefit Plan. Neither Seller nor any Affiliate of Seller is or has been a party to, or participated in a complete or partial withdrawal from any multiemployer plan as defined in Section 4001(a)(3) of ERISA or any similar plan.

4.12.    No Other Agreements to Sell the Assets. Seller has no commitment or legal obligation, absolute or contingent, to any Person other than Buyer to sell, assign, transfer or effect a sale of any of the Assets, to sell or effect a sale of any of its capital stock or to effect any merger, consolidation, liquidation, dissolution or other reorganization of Seller; or to enter into any agreement or cause the entering into of an agreement with respect to any of the foregoing.

4.13.    No Brokers. None of Seller and any of its officers, directors, employees, shareholders or Affiliates has employed or made any agreement with any broker, finder or other Person which will result in the obligation of Buyer or any of its Affiliates to pay any finder's fee, brokerage fee or commission or similar payment in connection with the transactions contemplated hereunder.

4.14.    As Is Where Is  Buyer shall acquire the Assets "as is" and "where is", and, except as specifically set forth above, any other representation or warranty with respect to the Assets, whether express or implied, is hereby disclaimed, including any representation or warranty as to merchantability or fitness for any particular purpose.

ARTICLE V.

REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller as follows, which representations and warranties are, as of the date hereof, and will be, as of the Closing Date, true and correct; subject, however, to any fact or facts disclosed in this Agreement or otherwise disclosed to Seller by Buyer:

5.1.    Organization of Buyer. Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.

5.2.    Authorization. Buyer has all requisite corporate power and authority, and has taken all corporate action necessary to execute and deliver this Agreement and each of the other instruments required or contemplated to be executed and delivered hereunder by Buyer, to consummate the transactions contemplated hereunder and thereunder and to perform its obligations hereunder and

11

thereunder. The execution and delivery of this Agreement and each of the other instruments required or contemplated to be executed and delivered hereunder by Buyer and the consummation by Buyer of the transactions contemplated hereunder and thereunder have been duly approved by its board of directors. No other corporate proceedings on the part of Buyer are necessary to authorize this Agreement, any of the other instruments required or contemplated to be executed and delivered hereunder by Buyer or the consummation of the transactions contemplated hereunder or thereunder. This Agreement has been duly executed and delivered by Buyer and is, and upon execution and delivery each of the other instruments required or contemplated to be executed and delivered hereunder by Buyer will be, the legal, valid and binding obligations of Buyer enforceable against Buyer in accordance with their respective terms.

5.3.    No Conflict or Violation. Neither the execution, delivery or performance of this Agreement or any other instruments required or contemplated to be executed and delivered hereunder by Buyer or the consummation of the transactions contemplated hereunder or thereunder, will (i) violate or conflict with any provision of the articles of incorporation or bylaws of Buyer; or (ii) violate any Regulation or Court Order, except for such violations or conflicts, which, in the aggregate, would not have a material adverse effect on the ability of Buyer to consummate the transactions contemplated hereunder.

5.4.    Consents and Approvals. To Buyer's knowledge, no notice to, declaration, filing or registration with, or authorization, consent or approval of, or Permit from, any Governmental Authority is required to be made or obtained by Buyer in connection with the execution, delivery and performance of this Agreement or any other instruments required or contemplated to be executed and delivered hereunder by Buyer or the consummation of the transactions contemplated hereunder or thereunder.

5.5.    No Brokers. Neither Buyer nor any of its officers, directors, employees, shareholders or Affiliates has employed or made any agreement with any broker, finder or similar agent or any Person or firm which will result in the obligation of Seller or any of its Affiliates to pay any finder's fee, brokerage fees or commission or similar payment in connection with the transactions contemplated hereby.

ARTICLE VI.

COVENANTS

6.1.    Covenants of Seller.

(a)    Conduct of the Business by Seller. Seller shall, except as contemplated by this Agreement, or as consented to by Buyer in writing, maintain the Assets in the ordinary course and not take any action inconsistent with this Agreement or with the consummation of the transactions contemplated hereunder. Without limiting the generality of the foregoing:

(i)    Seller shall not (y) enter into, extend, materially modify, terminate or renew any Contract other than in the ordinary course of business; or (z) sell, assign, transfer, convey, lease, mortgage, pledge or otherwise dispose of or encumber any Asset; and

(ii)    Seller shall (y) maintain the Assets in substantially their current state of repair, normal wear and tear excepted; and (z) comply with all Regulations applicable to the Assets, except where the failure to so comply would not have a material adverse effect on the operation of the Assets;

12

(b)    No Solicitation. From the date hereof through Closing or the earlier termination of this Agreement, none of Seller and its Representatives shall, directly or indirectly, enter into, solicit, initiate or continue any discussions or negotiations with, or encourage or respond to any inquiries or proposals by, or participate in any negotiations with, or provide any information to, or otherwise cooperate in any other way with, any Person other than Buyer and its Representatives, concerning the sale of the Assets or of any shares of its stock or any merger, consolidation, liquidation, dissolution or similar transaction involving Seller, that in any case, would in any way be inconsistent with or interfere with the transactions contemplated hereby. Seller shall not, directly or indirectly, solicit, initiate or encourage the submission of any proposal or offer from any Person relating to any such transaction or participate in any negotiations regarding, or furnish to any Person any information with respect to Seller for the purposes of, or otherwise cooperate in any way with, or assist or participate in, facilitate or encourage, any effort or attempt by any other Person to seek or effect any such transaction.

(c)    Notification of Certain Matters. From the date hereof through Closing, Seller, promptly upon obtaining knowledge thereof, shall give notice to Buyer of (i) the occurrence, or failure to occur, of any event which would be likely to cause any representation or warranty contained in this Agreement to be untrue or inaccurate in any material respect; and (ii) any failure of Seller to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder; *provided, however,* that no such disclosure shall cure or be deemed to cure any breach of a representation, warranty, covenant or agreement or to satisfy any condition. Seller shall promptly notify Buyer of any Default, the commencement of any Action, or any credible threat thereof, or any other event that occurs before Closing that could in any way materially affect the value or operation of any Asset.

(d)    Lien Clearance. Seller shall remove and release from the public records, effective as of the Closing Date, all UCC Financing Statements or other evidence of liens relating to any obligations owed to EMC and shall cooperate with Buyer, at no cost or expense to Seller, to enable Buyer to either (i) remove and release from the public records, effective as of the Closing Date, or (ii) reduce the underlying secured obligation to a sum certain not materially greater than the amount reflected on Schedule 4.10 hereto, plus any interest accrued thereon in the ordinary course since the date(s) set forth thereon, all liens with respect to the Assets other than any UCC Financing Statements which show Seller as the lessee under an equipment lease.

(e)    Consents. To the extent that the transactions contemplated hereunder cannot be consummated without the approval, consent or waiver of a third party, Seller shall use its best efforts to obtain such approval, consent or waiver; *provided, however,* that Seller shall not be obligated to pay any consideration for obtaining any such approval, consent or waiver other than nominal fees or transactional expenses requested by the third party.

6.2.    Covenants of Buyer. Effective for the period July 20, 1998 through the Closing Date, Buyer will pay (or reimburse) to Seller amounts which Seller can demonstrate to the reasonable satisfaction of Buyer have been paid or accrued on or subsequent to July 20, 1998 and are necessary to preserve and maintain the Assets, including payroll and arrearages that must be paid to the Southern California Air Quality Management District prior to July 31, 1998 (the "SCAQMD Fees"). If for any reason other than the fault of Buyer the transactions contemplated hereunder do not close, Seller will repay to Buyer the SCAQMD Fees.

6.3.    Of Each Party. Buyer and Seller shall (i) use their respective best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to consummate and make effective the transactions contemplated hereunder as soon as practicable

13

following the satisfaction or waiver of the conditions set forth in Article VII and Article VIII hereof; but in no event prior to August 1, 1998; (ii) execute any documents, instruments or conveyances of any kind which may be reasonably necessary or advisable to carry out any of the transactions contemplated hereunder; and (iii) cooperate with each other in connection with the foregoing.

    6.4.   <u>Employee Matters</u>.

        (a)   <u>Continued Employment</u>.  Seller shall cooperate with, and use its good faith efforts to assist Buyer in its efforts to secure satisfactory employment arrangements with, those employees of Seller to whom Buyer makes offers of employment.  Seller shall terminate, as of the Closing, its employment relationship with those of such employees to whom Buyer makes an offer of employment.  During the one (1) year period after the Closing Date, neither Seller nor any Affiliate of Seller shall, directly or indirectly, hire or offer employment to or seek to hire or offer employment to any employee of Seller whose employment is continued by Buyer after the Closing Date or any employee of Buyer or any successor or Affiliate of Buyer who is engaged in the operation of the Refinery, unless Buyer first terminates the employment of such employee or gives its written consent to such employment or offer of employment.

        (b)   <u>WARN</u>.  Seller shall comply with the requirements of the Worker Adjustment and Retraining Notification Act of 1988 with respect to any "plant closing" or "mass layoff", as those terms are defined in such Act, which may result from Seller's termination of the employment of any of the employees in connection with the sale of the Assets to Buyer or any of the other transactions contemplated by this Agreement.

        (c)   <u>Third Party Beneficiary</u>.  Nothing contained in this Agreement shall (i) confer upon any employee of Seller any right with respect to continuance of employment by Buyer, (ii) interfere with the right of Buyer to terminate the employment of any employee of Seller at any time, with or without cause, or (iii) otherwise create any third party beneficiary rights in any employee of Seller, any beneficiary or dependents thereof or any collective bargaining representative thereof, with respect to the compensation, terms and conditions of employment and benefits that may be provided to any employee of Seller by Buyer or under any Benefit Plan which Buyer may maintain.

ARTICLE VII.

<u>CONDITIONS TO SELLER'S OBLIGATIONS</u>

    The obligations of Seller to sell the Assets to the Buyer on the Closing Date and to consummate the transactions contemplated hereby are subject to the satisfaction or waiver, on or prior to the Closing Date, of each of the following conditions:

    7.1.   <u>Representations, Warranties and Covenants</u>.  All representations and warranties of Buyer contained in this Agreement that are qualified by materiality shall be true and correct and all other representations and warranties shall be true and correct in all material respects, in each instance at and as of the Closing Date as if such representations and warranties were made at and as of the Closing Date, and Buyer shall have performed in all material respects all agreements and covenants required hereby to be performed by it prior to or at the Closing.

    7.2.   <u>No Proceedings or Litigation</u>.  No Action by any Governmental Authority shall have been instituted for the purpose of enjoining or preventing, or which question the validity or legality of,

14

the transactions contemplated hereby and which would reasonably be expected materially to damage Seller if the transactions contemplated hereby are consummated. No preliminary or permanent injunction or other order, decree or ruling by any United States federal or state court of competent jurisdiction or by any United States federal or state governmental, regulatory or administrative agency or authority which prevents the consummation of the transactions contemplated hereby shall have been issued and remain in effect.

ARTICLE VIII.

CONDITIONS TO BUYER'S OBLIGATIONS

The obligations of Buyer to purchase the Assets and to consummate the transactions contemplated hereby are subject to the satisfaction or waiver, on or prior to the Closing Date, of each of the following conditions:

8.1.     Representations, Warranties and Covenants. All representations and warranties of Seller contained in this Agreement that are qualified by materiality shall be true and correct and all other representations and warranties shall be true and correct in all material respects, in each instance at and as of the Closing Date as if such representations and warranties were made at and as of the Closing Date, and Seller shall have performed in all material respects all agreements and covenants required hereby to be performed by it prior to or at the Closing.

8.2.     No Proceedings or Litigation. No Action by any Governmental Authority shall have been instituted for the purpose of enjoining or preventing, or which question the validity or legality of, the transactions contemplated hereby and which would reasonably be expected materially to damage Seller if the transactions contemplated hereby are consummated. No preliminary or permanent injunction or other order, decree or ruling by any United States federal or state court of competent jurisdiction or by any United States federal or state governmental, regulatory or administrative agency or authority which prevents the consummation of the transactions contemplated hereby shall have been issued and remain in effect.

8.3.     Title Insurance. Buyer shall have received a commitment for a standard coverage ALTA policy or policies of title insurance with respect to the Refinery, with such endorsements thereto as Buyer shall reasonably require, pursuant to which the Title Company agrees to insure, at its regular rates in the amount of at least Fifteen Million Dollars ($15,000,000), good and marketable title to the Refinery subject only to the Permitted Encumbrances with respect thereto.

8.4.     Lien Clearance. Buyer shall have received, in form and substance satisfactory to Buyer, (i) UCC termination statements, reconveyances, releases or other instruments sufficient to remove and release from the public records all liens relating to any obligations owed to EMC; and (ii) either (y) lien releases, in the form of UCC termination statements, reconveyances, releases or otherwise, of all liens on the Assets; or (z) other assurances satisfactory to Buyer that it will be able to remove and release all such liens from the public records following the Closing Date upon the payment of a sum certain not materially greater than the amount(s) reflected on Schedule 4.10 hereto; *provided, however*, that the condition set forth in clause (ii) above shall be limited to liens where the potential amount thereof, relative to the Assets secured thereby, could have a material adverse effect on Buyer.

15

ARTICLE IX.

TERMINATION

This Agreement may be terminated at any time prior to Closing:

(i)    by mutual written consent of Buyer and Seller;

(ii)    by Buyer or Seller if the Closing shall not have occurred on or before the Scheduled Closing Date; *provided, however,* that this provision shall not be available to Buyer if Seller has the right to terminate this Agreement under clause (iv)(x) of this Article IX, and this provision shall not be available to Seller if Buyer has the right to terminate this Agreement under clause (iii)(x) of this Article IX;

(iii)    by Buyer if there is (x) a material breach of any representation or warranty set forth in Article IV hereof or any covenant or agreement to be complied with or performed by Seller pursuant to the terms of this Agreement; (y) a failure of a condition set forth in Article VIII to be satisfied (and such condition is not waived in writing by Buyer) on or prior to the Closing Date; or (z) an occurrence of any event which results or would result in the failure of a condition set forth in Article VIII to be satisfied on or prior to the Closing Date; *provided, however,* that Buyer may not terminate this Agreement prior to Closing if Seller has not had an adequate opportunity to cure such failure; or

(iv)    by Seller if there is (x) a material breach of any representation or warranty set forth in Article V hereof or of any covenant or agreement to be complied with or performed by Buyer pursuant to the terms of this Agreement; (y) a failure of a condition set forth in Article VII to be satisfied (and such condition is not waived in writing by Seller) on or prior to the Closing Date; or (z) an occurrence of any event which results or would result in the failure of a condition set forth in Article VII to be satisfied on or prior to the Closing Date; *provided, however,* that Seller may not terminate this Agreement prior to the Closing Date if Buyer has not had an adequate opportunity to cure such failure.

In the event of any termination of this Agreement, no party hereto shall have any Liability to any other party to this Agreement, except for any willful breach of this Agreement occurring prior to the proper termination of this Agreement. The foregoing provisions shall not limit or restrict the availability of specific performance or other injunctive relief to the extent that specific performance or such other relief would otherwise be available to a party hereunder.

ARTICLE X.

ACTIONS BY SELLER AND BUYER AFTER CLOSING

10.1.    Books and Records. Each party agrees that it will cooperate with and make available to the other parties, during normal business hours, the Books and Records, information and employees (without substantial disruption of employment) retained and remaining in existence after Closing which are necessary or useful in connection with any tax inquiry, audit, investigation or dispute, any litigation or investigation or any other matter requiring any such Books and Records, information or employees for

16

any reasonable business purpose. The party requesting any such Books and Records, information or employees shall bear all of the out-of-pocket costs and expenses, including attorneys' fees, but excluding reimbursement for salaries and employee benefits reasonably incurred in connection with providing such Books and Records, information or employees. In addition, Buyer shall permit Seller to store at the Refinery any financial records or other financial information that it retains pursuant to this Agreement and provide to Seller reasonable access to such materials at no charge to Seller.

10.2.    Cooperation and Records Retention. Buyer and Seller shall (i) each provide the other with such assistance as may reasonably be requested by any of them in connection with the preparation of any Tax Return, audit, or other examination by any taxing authority or judicial or administrative proceedings relating to Liability for Taxes of Seller; and (ii) each retain and provide the other with any records or other information that may be relevant to such return, audit or examination, proceeding or determination.

10.3.    Tax Elections. Seller shall make no new elections with respect to Taxes that affect Buyer or the Assets or any changes in current elections with respect to Taxes affecting Buyer or the Assets, without, in each instance, the prior written consent of Buyer.

10.4.    Indemnification.

(a)    By Seller. Seller shall indemnify, save and hold harmless Buyer and its Affiliates and its and their respective Representatives from and against any and all costs, losses, Taxes, Liabilities, obligations, damages, lawsuits, deficiencies, claims, demands and expenses (whether or not arising out of third-party claims), including interest, penalties, attorneys' fees and all amounts paid in investigation, defense or settlement of any of the foregoing (collectively hereafter, for purposes of this Section 10.4, "damages") incurred in connection with, arising out of, resulting from or incident to (i) any breach of any representation or warranty or the inaccuracy of any representation made by Seller in or pursuant to this Agreement; (ii) any breach of any covenant or agreement made by Seller in or pursuant to this Agreement; or (iii) any Excluded Liability; excluding, however, any damages attributable to any failure to pay sales and use taxes, if any, imposed on the sale and subsequent repossession of certain elements of the Refinery to Kenyen Projects Limited and the amounts payable by Seller pursuant to the Environmental Indemnity and Reimbursement Agreement.

(b)    By Buyer. In addition to the obligations of Seller pursuant to the Environmental Indemnity and Reimbursement Agreement, Buyer shall indemnify, save and hold harmless Seller, its Affiliates and its and their respective Representatives, from and against any and all damages incurred in connection with, arising out of, resulting from or incident to (i) any breach of any representation or warranty or the inaccuracy of any representation, made by Buyer in or pursuant to this Agreement; (ii) any breach of any covenant or agreement made by Buyer in or pursuant to this Agreement; (iii) any Assumed Liability; (iv) the litigation identified in Schedule 4.9 hereto; and (v) any claim relating to creditors identified in Schedule 4.10 hereto, but only to the extent of the amounts set forth as owing thereon, without duplication, plus any interest accrued thereon in the ordinary course since June 30, 1998.

(c)    Defense Of Claims. If a claim for damages, other than a claim by Seller pursuant to and governed by the Environmental Indemnity and Reimbursement Agreement (a "Claim") is to be made by a party entitled to indemnification hereunder against the indemnifying party, the party claiming such indemnification shall give written notice (a "Claim Notice") to the indemnifying party as soon as practicable after the party entitled to indemnification becomes aware of any fact, condition or event which may give rise to damages for which indemnification may be sought under this Section 10.4. If any lawsuit or enforcement Action is filed against any party entitled to the benefit of indemnity

17

hereunder, written notice thereof shall be given to the indemnifying party as promptly as practicable (and in any event within thirty (30) days after the service of the citation or summons). The failure of any indemnified party to give timely notice hereunder shall not affect rights to indemnification hereunder, except to the extent that the indemnifying party demonstrates actual damage caused by such failure. After such notice, if the indemnifying party shall acknowledge in writing to the indemnified party that the indemnifying party shall be obligated under the terms of its indemnity hereunder in connection with such lawsuit or Action, then the indemnifying party shall be entitled, if it so elects at its own cost, risk and expense, (i) to take control of the defense and investigation of such lawsuit or Action; (ii) to employ and engage attorneys of its own choice to handle and defend the same unless the named parties to such Action or proceeding include both the indemnifying party and the indemnified party and the indemnified party has been advised in writing by counsel that there may be one or more legal defenses available to such indemnified party that are different from or additional to those available to the indemnifying party, in which event the indemnified party shall be entitled, at the indemnified party's cost, risk and expense, to separate counsel of its own choosing; and (iii) to compromise or settle such Claim. If the indemnifying party fails to assume the defense of such Claim within thirty (30) days after receipt of the Claim Notice, the indemnified party against which such Claim has been asserted will have the right to undertake, at the indemnifying party's cost and expense, the defense, compromise or settlement of such Claim on behalf of and for the account and risk of the indemnifying party; *provided, however,* that such Claim shall not be compromised or settled without the written consent of the indemnifying party, which consent shall not be unreasonably withheld. In the event the indemnified party assumes the defense of the Claim, the indemnified party will keep the indemnifying party reasonably informed of the progress of any such defense, compromise or settlement.

10.5.   Insurance Policies.   To the extent any of the Insurance Policies cannot be assigned without the consent of the carrier thereunder, until such time as such consent is obtained or is no longer necessary, Seller will make available to Buyer any and all rights and benefits under such Policy in order to enable Buyer to mitigate the impact of the Assumed Liabilities and the other liabilities of Buyer hereunder, including Buyer's indemnification obligations hereunder and under the Environmental Indemnity and Reimbursement Agreement.

## ARTICLE XI.

## MISCELLANEOUS

11.1.   Assignment.   Neither this Agreement nor any of the rights or obligations hereunder may be assigned by any party without the prior written consent of the other parties; *provided, however,* that Buyer may, without such consent, assign all such rights to any lender as collateral security and assign all such rights and obligations to a subsidiary or subsidiaries of Buyer or to a successor in interest to Buyer which shall assume all obligations and Liabilities of Buyer under this Agreement; *provided, however,* that no such assignment shall relieve Buyer of its obligations under this Agreement. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, and no other Person shall have any right, benefit or obligation under this Agreement as a third party beneficiary or otherwise.

11.2.   Confidentiality. The parties hereto acknowledge that the transactions contemplated hereunder are of a confidential nature and neither party shall make an announcement of this Agreement, in whole or in part, or the transaction contemplated hereby, to the public or any third party (except as expressly herein permitted), other than with the express written consent of the other party hereto. Further, until the Closing Date, all "Confidential Information" (as hereinafter defined) acquired by Buyer with respect to Seller, except for such disclosure as may be required by law or disclosures made with the

mutual consent of the parties hereto, shall be (i) maintained in confidence, (ii) used only for the purpose of and in connection with evaluating the business of Seller and (iii) disclosed only to employees, attorneys, consultants and other advisors to Buyer who have a need to know the information, *provided, however,* that with respect to information received by Buyer regarding Taxes, Buyer will use its best efforts to keep such information confidential and not disclose the same other than pursuant to advice of counsel or underwriters. If such advice is given, Buyer will promptly notify Seller of same. For the purposes of this Agreement, the term "Confidential Information" shall mean all information acquired by Buyer from Seller with respect to the business of Seller other than (x) information generally available to the public, (y) information which becomes available to Buyer from a source other than Seller or (z) was within Buyer's possession prior to its being furnished to Buyer pursuant to this Agreement.

11.3.    Survival of Representations. All of the representations, warranties, covenants and agreements made by Seller or Buyer in this Agreement or in any attachment, exhibit, schedule, certificate, document or list delivered by any such party pursuant hereto shall survive Closing and the delivery of any conveyancing instruments hereunder until the second anniversary of the Closing Date.

11.4.    Notices. All notices, requests, demands and other communications which are required or may be given under this Agreement shall be in writing and shall be deemed to have been duly given when received if personally delivered; one (1) Business Day after transmission if transmitted by telecopy, electronic or digital transmission, one (1) Business Day after it is sent if sent for next day delivery to a domestic address by recognized overnight delivery service (e.g., FedEx); and upon receipt, if sent by certified or registered mail, return receipt requested. In each case notice shall be sent to:

If to Buyer to:

        CENCO, Inc.
        c/o Dean J. Nelson Happy
        Regent University School of Law
        1000 Regent University Drive
        Virginia Beach, Virginia 23464-9880

With a copy to:

        Latham & Watkins
        633 W. Fifth Street
        Suite 4000
        Los Angeles, California 90071
        Attention: David V. Lee, Esq.

If to Seller to:

        Vincent Papa, Esq.
        Managing Director and General Counsel
        PMG Capital Corp.
        General Motors Building
        767 Fifth Avenue, 23rd Floor
        New York, New York 10153

With a copy to:

        Loeb & Loeb
        1000 Wilshire Boulevard
        Suite 1800
        Los Angeles, California 90017
        Attention: Robert S. Barry, Jr., Esq.

or to such other place and with such other copies as either party may designate as to itself by written notice to the others.

    11.5.   Choice of Law. This Agreement shall be construed and interpreted and the rights of the parties shall be determined in accordance with the laws of the State of California, except with respect to matters of law concerning the internal corporate affairs of any corporate entity which is a party to or the subject of this Agreement, and as to those matters the law of the jurisdiction under which the respective entity derives its powers shall govern.

    11.6.   Entire Agreement; Amendments and Waivers. This Agreement, together with all exhibits and schedules referred to herein, and the Environmental Indemnity and Reimbursement Agreement, constitutes the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties. This Agreement may not be amended except by an instrument in writing signed on behalf of each of the parties hereto. No amendment, supplement, modification or waiver of this Agreement shall be binding unless executed in writing by the party to be bound thereby. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

    11.7.   Multiple Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

    11.8.   Invalidity. In the event that any one or more of the provisions of this Agreement or in any other instrument referred to herein, shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, then to the maximum extent permitted by law, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement or any other such instrument.

    11.9.   Cumulative Remedies. All rights and remedies of either party hereto are cumulative of each other and of every other right or remedy such party may otherwise have at law or in equity, and the exercise of one or more rights or remedies shall not prejudice or impair the concurrent or subsequent exercise of other rights or remedies.

                        

11.10.  <u>Attorneys' Fees</u>.  If any party to this Agreement brings an Action to enforce its rights under this Agreement, the prevailing party shall be entitled to recover its costs and expenses, including reasonable attorneys' fees, incurred in connection with such Action, including any appeal of such Action.

(Signature Page Follows)

21

07/27/98 10:11

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase
Agreement to be signed by their respective officers thereunto duly authorized, all as of the date first
written above

CENCO REFINING CO.,
a Delaware corporation

By: _____
Name:
Title:

POWERINE OIL COMPANY,
a California corporation

By: _____
Name:
Title:

S-1

PAGE.002                                                    JUL 27 '98 10:30

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be signed by their respective officers thereunto duly authorized, all as of the date first written above.

CENCO REFINING CO.,
a Delaware corporation

By: _____
Name:
Title:

POWERINE OIL COMPANY,
a California corporation

By: _____
Name:
Title:

S-1

NY_DOCS\219564.10

POLICY BUY-BACK, SETTLEMENT AGREEMENT AND RELEASE

IN WITNESS WHEREOF, this Agreement has been read and signed in duplicate
originals by the duly authorized representatives of the Parties.

TRAVELERS CASUALTY AND SURETY COMPANY
AND THE TRAVELERS INDEMNITY COMPANY

By: _____        Date: _____

Title: _____

CENCO Refining Company

By: _____        Date: 5-2-00

Title: PRESIDENT

Page 6 of 9

*Cenco*

## ENVIRONMENTAL INDEMNITY AND REIMBURSEMENT AGREEMENT

This Environmental Indemnity and Reimbursement Agreement (this "Agreement"), dated as of August 1o, 1998, is by and between Powerine Oil Company, a California corporation ("Seller"), and CENCO Refining Co., a Delaware corporation ("Buyer"), and is meant to supplement that certain Asset Purchase Agreement (the "Purchase Agreement") dated as of July 24, 1998 by and between Seller and Buyer.

### RECITALS

A.    Upon the terms and subject to the conditions set forth in the Purchase Agreement, Seller agreed to convey to Buyer the Refinery, the Pipelines and certain other assets used or useful in connection with the operation of the Refinery.

B.    In accordance with the Purchase Agreement and as a material component in establishing the consideration for the assets purchased thereunder, Seller and Buyer have agreed to enter into this Agreement to set forth their respective responsibilities for potential environmental liabilities and defense costs related to certain claimed environmental liabilities.

NOW, THEREFORE, in consideration of the foregoing recitals and the terms and conditions set forth below, and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, Buyer and Seller agree as follows:

### ARTICLE I.

### DEFINITIONS

Capitalized terms used herein that are not otherwise defined shall have the meanings ascribed to such terms in the Purchase Agreement.  The following terms shall have the meanings ascribed to them as set forth below:

"Release" means any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, disbursal, leaching or migration into the indoor or outdoor environment or into or out of any property, including, without limitation, the movement of Hazardous Substances through or in the air, soil, surface water, ground water or property.

"Remedial Action" means all actions required to (i) clean up, remove, treat or in any other way address Hazardous Substances in the indoor or outdoor environment, (ii) prevent the Release or threat of Release or minimize the further Release of Contaminants so they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment, or (iii) perform pre-remedial studies and investigations and post-remedial monitoring and care.

## ARTICLE II.

### DAMAGES AND DEFENSE COSTS

2.1.    Indemnity for Purchased Assets.  Seller shall have no liability to Buyer and Buyer shall defend, indemnify, save and hold harmless Seller, its Affiliates, each of their assigns and successors and its and their respective Representatives, from and against any and all costs, losses, liabilities (including liabilities arising under CERCLA or personal injury or property damage claims, including claims for diminution in value), obligations, damages, lawsuits, deficiencies, claims, demands and expenses (whether or not arising out of third-party claims), including interest, penalties, attorneys fees and all amounts paid in investigation, defense or settlement of any of the foregoing (collectively hereafter, "Damages") in connection with, resulting from, or incident to any liability or obligation arising out of any Remedial Action, Hazardous Substance on, under, about or from the Refinery (including off-site disposal sites), Release, and any Environmental Laws, which in each case pertain to the Refinery, the operations of the Refinery, or any real property or leasehold interest or other asset which constitutes a portion of the Refinery or the Pipelines (the "Purchased Assets"), whether arising prior to or after the transactions contemplated by the Purchase Agreement.

2.2.    Limited Indemnity for Other Property.  Buyer has not assumed or otherwise agreed to be responsible for, and Seller shall retain and shall discharge, perform and be fully responsible for, all of the obligations, fixed or contingent, known or unknown, matured or unmatured, of Seller relating to any petroleum terminal, storage facility, pipeline, service station or other property (other than the Purchased Assets) now or previously owned or operated by Seller, including the storage tanks and pipelines formerly operated by Seller at the Mission Valley Terminal in San Diego, California (each, for purposes of this Agreement, an "Other Property").  Notwithstanding the foregoing, but subject to the terms and conditions of this Agreement, Buyer shall indemnify Seller for Damages in connection with, resulting from, or incident to any liability or obligations arising out of any Remedial Action, Hazardous Substance on, under, about or from the Other Property, Release, and any Environmental Laws, which in each case pertain to the Other Property; provided, however, that in no event shall Buyer be liable or otherwise obligated for Damages, individually or in the aggregate, under this Section 2.2 in excess of One Million Five Hundred Thousand Dollars ($1,500,000) (the "Maximum Contribution").

## ARTICLE III.

### CONDITIONS TO BUYER'S OBLIGATIONS

3.1.    Conditions to Buyer's Obligations.  Buyer's duty to pay Seller under this Agreement for any Damages is subject to each of the following conditions, any of which may be waived by Buyer:

(a)    If a claim for Damages (a "Claim") is to be made by Seller hereunder, Seller shall give written notice (a "Claim Notice") to Buyer as soon as practicable (but not later than thirty (30) days) after the Seller becomes aware of any fact, condition or event which may give rise to such Damages.  The failure of Seller to give timely notice shall not affect rights to

2

reimbursement hereunder, except to the extent that Buyer demonstrates actual Damages caused by such failure.

(b)    Prior to any indemnification or reimbursement of Seller hereunder, Seller shall agree in writing to assign to Buyer all of Seller's: (i) rights and interests to receive proceeds for Damages under any policies of insurance which potentially cover the Damages at issue, except to the extent any applicable insurance policy has been assigned to Buyer pursuant to the Purchase Agreement; and (ii) any rights to contribution from third parties for Damages in connection with the Damages at issue.

(c)    Except to the extent any applicable insurance policy has been assigned to Buyer pursuant to the Purchase Agreement, Seller shall fulfill all obligations and take all actions required by each policy of insurance that may apply to the Damages at issue, including the timely submittal of necessary notices.

## ARTICLE IV.

### DEFENSE OF CLAIMS

4.1.    <u>Buyer's Rights and Obligations.</u>

4.1.1.    <u>Control of Defense.</u>    If Buyer, after receiving a Claim Notice, acknowledges in writing to Seller that Buyer shall be obligated under the terms of this Agreement to pay for the Damages referred to herein, then Buyer shall be entitled, if it so elects at its own cost, risk and expense, (i) to take control of the defense and investigation concerning such Damages; (ii) to employ and engage attorneys of its own choice to handle and defend the same unless the named parties to such action or proceeding include both the Seller and Buyer, and Seller shall have been advised in writing by counsel that there may be one or more legal defenses available to Seller that are different from or in addition to those available to the Buyer, in which event Seller shall be entitled, at its own cost, risk and expense, to separate counsel of its own choosing; and (iii) to settle such claim, so long as Buyer agrees to pay the full settlement amount. Seller shall provide promptly to Buyer any amounts paid on account of Damages paid hereunder that is paid to Seller under any of its insurance policies. Notwithstanding anything to the contrary set forth in the foregoing:

(a)    In no event shall Buyer be obligated to pay or assume any liability hereunder relating to Damages attributable to Other Property in excess of the Maximum Contribution; and

(b)    If in defending any Claim, or otherwise assuming any liability or obligation for Damages attributable to any Other Property, it becomes evident that the potential liability or obligation, when added to the aggregate amounts previously paid on account of Damages attributable to Other Property, could exceed One Million Five Hundred Thousand Dollars ($1,500,000), Buyer may, in lieu of further defending such Claim or otherwise incurring any liability or obligation for such Damages, pay to Seller the difference between (i) the aggregate amount previously paid on account of Damages attributable to Other Property and (ii) the Maximum Contribution. Upon such payment, Buyer's duty to defend such Claim, or any

other Claim, with respect to Other Property shall be satisfied and discharged in its entirety, at which point Seller shall assume exclusive control, at its sole cost and expense, of the defense, compromise or settlement of such Claim. Notwithstanding the foregoing, if Buyer decides not to make such payment, Seller may assume control of the defense of such Claim at Buyer's costs and expense, but in such instance, Buyer's obligation to pay such damages shall only continue until such time as the Maximum Contribution has been paid.

(c)    Buyer agrees that it will make available to Seller, as long as she is an employee of Buyer, the reasonable consultation of Ms. June Christman or her replacement, at no cost or expense to Seller.

4.2.    Seller's Rights and Obligations

4.2.1.    Seller's Right to Undertake Defense. If Buyer's indemnification of Seller for Damages attributable to Other Property has not exceeded the Maximum Contribution and if Buyer fails to assume the defense of a Claim within thirty (30) days after receipt of the Claim Notice, Seller shall (upon delivering notice to such effect to Buyer) have the right to undertake, at Buyer's cost and expense (but subject to the Maximum Contribution limits in Section 4.1.1 hereunder), the defense, compromise or settlement of such Claim, provided that Buyer shall have the exclusive right to approve reasonably and promptly Seller's choice of counsel and any experts, consultants and other professionals retained by Seller. In the event the Seller assumes the defense of the Claim, Seller shall keep Buyer reasonably informed of the progress of any such defense, compromise or settlement.

4.2.2.    Cooperation and Reasonableness. In connection with any Claim hereunder, Seller shall (i) as soon as reasonably practicable following receipt by Seller provide Buyer with copies of all notices, demands or other communications between Seller and any Governmental Authority and all reports, data, manifests, materials or other material documents concerning the liability or obligation underlying such Claim (the "Reports"); (ii) use reasonable efforts to provide Buyer with a reasonable opportunity to review and comment upon any Report which is to be submitted to a Governmental Authority prior to such submittal; (iii) use its best efforts to provide Buyer with reasonable opportunity to review and comment upon any agreement, settlement or action plan with a Governmental Authority before such document is finalized; and (iv) use reasonable efforts to provide Buyer with reasonable prior notice of any meeting between Governmental Authority and Seller and an opportunity to attend such meeting. In addition, Buyer and Seller shall cooperate in all reasonable respects with each other and their attorneys in the investigation, trial and defense of any pending lawsuit or other action and any appeal arising therefrom.

ARTICLE V.

MISCELLANEOUS

5.1.    No Third-Party Beneficiaries. This Agreement shall be binding upon and inure to the benefit of Seller and Buyer and their respective predecessors, successors and assigns. This Agreement is intended to confer rights and benefits only upon the Seller and Buyer (their successors and assigns) and is not intended to confer any right or benefit upon any Person. No

Person shall have any legally enforceable right hereunder. All rights of action for any breach of this Agreement are hereby reserved to the parties, their successors or assigns.

    5.2.   <u>Notices</u>. All notices, requests, demands and other communications which are required or may be given under this Agreement shall be in writing and shall be deemed to have been duly given when received if personally delivered: one (1) Business Day after transmission if transmitted by telecopy, electronic or digital transmission, one (1) Business Day after it is sent if sent for next day delivery to a domestic address by recognized overnight delivery service (e.g., FedEx); and upon receipt, if sent by certified or registered mail, return receipt requested. In each case notice shall be sent to:

    If to Buyer to:

        CENCO, Inc.
        c/o Dean J. Nelson Happy
        Regent University School of Law
        1000 Regent University Drive
        Virginia Beach, Virginia 23464-9880

    With a copy to:

        _____

        _____

        _____

        Attention:

    If to Seller to:

        Vincent Papa, Esq.
        Managing Director and General Counsel
        PMG Capital Corp.
        Managing Director and General Counsel
        General Motors Building
        767 Fifth Avenue, 23rd Floor
        New York, New York

    With a copy to:

        Loeb & Loeb
        1000 Wilshire Boulevard
        Suite 1800
        Los Angeles, California 90017
        Attention: Robert S. Barry, Jr. Esq.

or to such other place and with such other copies as either party may designate as to itself by written notice to the others.

5.3.    Choice of Law.  This Agreement shall be construed, interpreted and the rights of the parties determined in accordance with the laws of the State of California (without reference to the choice of law provisions of California law), except with respect to matters of law concerning the internal corporate affairs of any corporate entity which is a party to or the subject of this Agreement, and as to those matters the law of the jurisdiction under which the respective entity derives its powers shall govern.

5.4.    Entire Agreement; Amendments and Waivers.  This Agreement, together with the Purchase Agreement and all Exhibits, Schedules and ancillary agreements thereto, constitute the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties.  This Agreement may not be amended except by an instrument in writing signed on behalf of each of the parties hereto.  No amendment, supplement, modification or waiver of this Agreement shall be binding unless executed in writing by the party to be bound thereby.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

5.5.    Conflict with Purchase Agreement.  This Agreement is intended to modify and supplement certain of the terms of the Purchase Agreement with respect to the parties' rights and obligations with respect to certain environmental matters.  In the event of any conflict or ambiguity between the Purchase Agreement and this Agreement, the provisions of the Purchase Agreement shall control.

5.6.    Multiple Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

5.7.    Invalidity.  In the event that any one or more of the provisions contained in this Agreement or in any other instrument referred to herein, shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, then to the maximum extent permitted by law, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement or any other such instrument.

5.8.    Cumulative Remedies.  All rights and remedies of either party hereto are cumulative of each other and of every other right or remedy such party may otherwise have at law or in equity, and the exercise of one or more rights or remedies shall not prejudice or impair the concurrent or subsequent exercise of other rights or remedies.

5.9.    Headings.  The headings of the Articles and Sections herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

5.10.    Attorneys' Fees.  If any party to this Agreement brings an Action to enforce its rights under this Agreement, the prevailing party shall be entitled to recover its costs and expenses, including reasonable attorneys' fees incurred in connection with such Action, including any appeal of such Action.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, or have caused this Agreement to be duly executed on their respective behalf by their respective officers thereunto duly authorized, as of the day and year first above written.

BY OWNER:

                                   CENCO REFINING CO.,
                                   a Delaware corporation

                                 By: _____
                                 Name:  Marshall Staunton
                                 Title:    Secretary

BY SELLER:

                                   POWERINE OIL COMPANY,
                                   a California corporation

                                 By: _____
                                 Name:  Michael Egner
                                 Title:    Vice President

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, or have caused this Agreement to be duly executed on their respective behalf by their respective officers thereunto duly authorized, as of the day and year first above written.

BY OWNER:

CENCO REFINING CO.,
a Delaware corporation

By: _____
Name:   Marshall Staunton
Title:   Secretary

BY SELLER:

POWERINE OIL COMPANY,
a California corporation

By: _____
Name:   Siegfried K. Hodapp,
Title:   President

S-1

# EXHIBIT C

1  DAVID R. ISOLA, ESQ. SBN 150311
   STEPHEN B. ARDIS, ESQ. SBN 162947
2  **ISOLA LAW GROUP, LLP**
   405 West Pine Street
3  Lodi, California 95240
   Telephone: (209) 367-7055
4  Facsimile: (209) 367-7056
   e-mail: disola@isolalaw.com
5  e-mail: sardis@isolalaw.com

6  Attorneys for Defendant and Cross-Complainant,
   POWERINE OIL COMPANY
7

8

9              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

10                  **FOR THE COUNTY OF LOS ANGELES**

11

12  ACE PROPERTY & CASUALTY          )  CASE NO. BC397070
    INSURANCE COMPANY (formerly      )
13  known as CIGNA PROPERTY &        )  Assigned to Hon. Amy Hogue
    CASUALTY INSURANCE COMPANY,      )  Dept. CCW - 307
14  formerly known as AETNA INSURANCE )
    COMPANY); and CENTRAL            )
15  NATIONAL INSURANCE COMPANY       )  DECLARATION OF LOWELL MORSE IN
    OF OMAHA,                        )  OPPOSITION TO MOTION FOR
16                                   )  SUMMARY JUDGMENT RE: IMPACT OF
                                     )  CALIFORNIA SUPREME COURT'S *FLUOR*
17          Plaintiffs,              )  DECISION
                                     )
18      vs.                          )
                                     )  **DATE: March 9, 2016**
19  CERTAIN UNDERWRITERS AT          )  **TIME:  2:00**
    LLOYD'S LONDON; HARBOR           )  **DEPT:  CCW-307**
20  INSURANCE COMPANY; et al.,       )
                                     )
21          Defendants.             )
                                     )
22  _____  )
                                     )
23  AND RELATED CROSS-ACTIONS.       )  Trial Date: July 12, 2016
                                     )  Complaint Filed: August 26, 2008
24                                   )  Cross-Complaint: October 27, 2008

25

26  I, Lowell Morse, declare as follows:

27      1. The matters declared to below are true and correct to the best of my knowledge, and if

28  called upon to do so, I could and would competently testify as to the matters.

_____
                   DECLARATION OF LOWELL MORSE

2.  From 2001 through 2004, I served as President and Chief Executive Officer of CENCO Refining Company, which became "Lakeland Development Company" by way of a corporate name change.

3.  My principle objective on Lakeland's behalf was to sell the company's real estate at the best terms possible. Consequently, I was very cognizant of the environmental liabilities associated with the real estate and how these liabilities could adversely impact a sale of the property.

4.  During the time I served as Lakeland's President and CEO, I was aware that the 1998 Asset Purchase Agreement with Powerine contained a provision entitling Lakeland to be assigned Powerine's liability insurance policies. I was also aware that Lakeland and Powerine had previously agreed not to pursue the assignment as being in neither company's best interest.

5.  Based on my objective of selling the real estate for the best terms possible, my judgment was to not request that Powerine assign the policies in that doing so would have caused environmental liabilities being defended by Powerine to be enforced against Lakeland.

I declare under penalty of perjury pursuant to the laws of the State of California that the foregoing is true and correct. Executed on February 8, 2016, at WILSONVILLE, Oregon.

LOWELL MORSE

# EXHIBIT D

DAVID R. ISOLA, ESQ. SBN 150311
STEPHEN B. ARDIS, ESQ. SBN 162947.
**ISOLA LAW GROUP, LLP**
405 West Pine Street
Lodi, California 95240
Telephone: (209) 367-7055
Facsimile: (209) 367-7056
e-mail: disola@isolalaw.com
e-mail: sardis@isolalaw.com

Attorneys for Defendant and Cross-Complainant,
POWERINE OIL COMPANY

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| ACE PROPERTY & CASUALTY INSURANCE COMPANY (formerly known as CIGNA PROPERTY & CASUALTY INSURANCE COMPANY, formerly known as AETNA INSURANCE COMPANY); and CENTRAL NATIONAL INSURANCE COMPANY OF OMAHA,<br><br>                    Plaintiffs,<br><br>          vs.<br><br>CERTAIN UNDERWRITERS AT LLOYD'S LONDON; HARBOR INSURANCE COMPANY; NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA; and DOES 1 through 25, inclusive,<br><br>                    Defendants.<br><br>AND RELATED CROSS-ACTIONS. | CASE NO. BC397070<br><br>Assigned to Hon. Amy Hogue<br>Dept. CCW - 307<br><br>DECLARATION OF VINCENT PAPA IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT RE: IMPACT OF CALIFORNIA SUPREME COURT'S *FLUOR* DECISION<br><br>**DATE: March 9, 2016**<br>**TIME: 2:00**<br>**DEPT: CCW-309**<br><br><br>Trial Date: July 12, 2016<br>Complaint Filed: August 26, 2008<br>Cross-Complaint: October 27, 2008 |

I, Vincent Papa, declare:

1. The matters declared to are true and correct to the best of my personal knowledge, and if called upon to do so, I could and would competently testify to these matters.

2. I am presently the President of Powerine Oil Company ("Powerine"), and until June 2015, I served as Secretary and General Counsel for both Powerine and Lakeland Development Company ("Lakeland").

3. My complete history with Powerine and Lakeland is as follows:

a. I presently serve as Powerine's General Counsel, a position I have held since 1995.

b. I presently serve as Powerine's President, a position I have held since March 2015. I was elected President upon the death of Siegfried Hodapp the founder of EMC.

c. In March 2004, Lakeland was acquired by EMC Capital Corp., a subsidiary of Energy Merchant Corp. ("EMC"), which is the same company that holds Powerine's stock; I was appointed Secretary and General Counsel of Lakeland such that between March 2004 and June 2015. I simultaneously served as General Counsel and Secretary for both Powerine and Lakeland..

d. From March 2015 to June 2015, I served as both Lakeland's President and General Counsel. My positions with Lakeland ended in June 2015 when Lakeland's Chapter 11 reorganization was ordered by the Bankruptcy Court to be converted to Chapter 7 liquidation and a Trustee was appointed to manage Lakeland's winding down.

4. Throughout my tenure with Powerine, among my responsibilities has been participating in the development and implementation of strategies for purposes of minimizing and mitigating Powerine's environmental and toxic liabilities. Throughout my tenure with Lakeland, among my responsibilities has been participating in the development and implementation of strategies for purposes of avoiding any and all environmental and toxic liabilities.

5. In 1998, Powerine entered into an Asset Purchase Agreement with Lakeland whereby Lakeland acquired substantially all of Powerine's assets. At the time I was General Counsel of EMC and assisted in the drafting and negotiation of the various agreements. Included in the Asset Purchase Agreement were provisions stating that Powerine assigns its liability policies to Lakeland, and that Lakeland assumes Powerine's environmental and toxic liabilities. During the

---

DECLARATION OF VINCENT PAPA

negotiations it was understood by all parties that Powerine would have to request assignment and the insurance companies would have to approve. Therefore the Asset Purchase Agreement included provisions to cover the likelihood that the insurance companies would not approve of the assignment of the policies. The Asset Purchase Agreement also contained an Environmental Indemnity and Reimbursement Agreement, under which CENCO/Lakeland was to indemnify Powerine for any costs or losses associated with the assumed environmental and toxic liabilities.

6. Between July 1998 and March 2004, when Lakeland was sold to EMC Capital Corp., Lakeland never requested that Powerine assign or seek assignment of the insurance policies pursuant to the Asset Purchase Agreement. Between March 2004 until June 2015 Lakeland intentionally and deliberately never requested that Powerine assign or seek approval of the insurance companies for the assignment of the policies and I am not aware of any request by the Lakeland Chapter 7 Trustee that Powerine seek assignment of the policies.

7. From July 1998 to the present, Powerine intentionally and deliberately never requested consent from its insurers to assign the insurance policies to Lakeland pursuant to the Asset Purchase Agreement.

8. Although the terms of the Asset Purchase Agreement provided for the transfer of Powerine's liability insurance policies to Lakeland, and provided for Lakeland's assumption of Powerine's environmental and toxic liabilities, the decision was made to have Powerine continue, to the extent feasible, to be the responsible party for purposes of defending and resolving the environmental and toxic liabilities.

9. It was my understanding, with other officers involved in these discussions, that the contemplated transfer of liability insurance policies from Powerine to Lakeland would require approval and consent by the numerous insurance carriers that had insured Powerine, and that there were many questions based upon California law at the time as to whether such an assignment could ever be completed.

10. Because of (a) the extreme uncertainty surrounding whether an assignment could be effectuated based on controlling insurance law at the time; (b) the anticipated refusal by the governmental and private party environmental claimants to substitute CENCO/Lakeland in Powerine's place for purposes of pursuing their claims; and, (c) the unwanted consequence of

DECLARATION OF VINCENT PAPA

triggering potentially CENCO/Lakeland's obligation to indemnify Powerine for the identical liabilities covered under the policies, in the judgment of Powerine's and Lakeland's officers, both corporations' best interests would be served by not taking any action that could disrupt the insurance coverage being afforded to Powerine for purposes of resolving the significant environmental and toxic liabilities. Accordingly, the decision was made by Powerine and Lakeland to forego any efforts to effectuate the insurance policy assignment described in the Asset Purchase Agreement.

11. In addition to the reasons stated above for not pursuing assignment, at the time of the Asset Purchase Agreement Powerine was in litigation with ACE and other carriers over a number of insurance policies including the policies at issue in this case. That action, <u>Highlands Insurance Company v. Powerine Oil Company</u>, and related cross-actions, Los Angeles Superior Court, case no. VC025771, ultimately led to not one but two separate writ proceedings decided by the California Supreme Court: <u>Certain Underwriters at Lloyds of London v. Superior Court</u> (2001) 24 Cal.4th 945 (Powerine I) and <u>Powerine Oil Co. v. Superior Court</u> (2005) 37 Cal.4th 377 (Powerine II). Powerine II involved the same policies at issue in this case. Powerine and Lakeland each independently decided that the likely chaos caused by an attempted assignment of the policies would not be in either company's best interest in light of the then-pending insurance coverage litigation and related writ practice.

12. In March 2004, the capital stock of Lakeland was acquired by a subsidiary of EMC. At this point in time, all shares of the capital stock of both Lakeland and Powerine were owned by EMC. I was Secretary and General Counsel of both Lakeland and Powerine.

13. As described above, pursuant to mutual agreement between Lakeland and Powerine, there had been no effort to complete the assignment of insurance policies. EMC decided that its subsidiaries, Powerine and Lakeland, would continue with the arrangement whereby Powerine would continue to be the work part for defending and resolving the environmental and toxic liabilities.

14. In fact, in a meeting in April 2015 at ACE's headquarters that I participated in, counsel for ACE with ACE officers being present stated that ACE would never agree to the assignment of the policies. This view by ACE apparently changed after <u>Fluor</u> when ACE

---

DECLARATION OF VINCENT PAPA

concluded that their liability would be lower if the policies were transferred to a Chapter 7 entity.

15. The decision by EMC for Powerine to continue to be the work party for defending and resolving the environmental and toxic liabilities served Lakeland's best interest by keeping Lakeland in the background for purposes of the liabilities while Lakeland was attempting to sell the former Powerine refinery site for redevelopment purposes.

I declare under penalty of perjury of the laws of the State of California that the foregoing is true and correct to the best of my knowledge and belief, and that this declaration was executed on this 15 day of February, 2016 at _Boca Raton_ , New York. _FLORIDA_

_Vincent Papa_
VINCENT PAPA

---

DECLARATION OF VINCENT PAPA